UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————x

BRUCE A. BLAKEMAN, in his capacity as County Executive of the County of Nassau, COUNTY OF NASSAU, MARC MULLEN as parent and natural guardian of K.E.M., an infant under the age of eighteen years, and JEANINE MULLEN, as parent and natural guardians of K.E.M., an infant under the age of eighteen years,

Case No.  2:24-cv-01655

Plaintiffs,

-against-

LETITIA JAMES, as Attorney General of the State of New York, STATE OF NEW YORK OFFICE OF THE ATTORNEY GENERAL, and STATE OF NEW YORK,

Defendants.

———————————————————————x

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF
APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 1

TABLE OF AUTHORITIES ........................................................................................ 2

STATEMENT OF FACTS ............................................................................................ 5

REQUEST FOR INJUNCTIVE RELIEF ..................................................................... 6

       CLASSIFICATION BASED ON SEX IS PERMISSIBLE UNDER EQUAL
       PROTECTION .................................................................................................... 7

       BIOLOGY AND SCIENCE SUPPORT NASSAU COUNTY'S EXECUTIVE
       ORDER ............................................................................................................ 10

       NASSAU COUNTY BELIEVES IN MAINTAINING A LEVEL PLAYING FIELD
       FOR ALL WOMEN INVOLVED IN SPORTS AND TO PREVENT FURTHER
       PHYSICAL AND EMOTIONAL DAMAGE ...................................................... 14

       THE LAW THAT THE NYS ATTORNEY GENERAL SEEKS TO ENFORCE IS
       VAGUE, OVERBROAD, AND THE ATTORNEY GENERAL'S
       INTERPRETATION RUNS CONTRARY TO FEDERAL EQUAL PROTECTION
       LAW AND FEDERAL STATUTE ................................................................... 19

       FEDERAL COURTS HAVE SUPPORTED THE COUNTY'S POSITION ............ 21

       ARGUMENTS IN SUPPORT OF A TEMPORARY RESTRAINING ORDER ..... 23

     LIKELIHOOD OF SUCCESS ............................................................................ 24

     IRREPARABLE HARM .................................................................................... 25

     BALANCE OF HARMS AND PUBLIC INTEREST ...................................... 26

CONCLUSION ........................................................................................................ 27

## TABLE OF AUTHORITIES

**Cases**

*Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022).............. 9

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995)................................................... 14

*Am. Civil Liberties Union v. Ashcroft*, 322 U.S. 240 (3d Cir. 2003)........................................... 26

*B.P.J. v. W. Va. State Bd. of Educ.*, 649 F. Supp. 3d 220 ........................................................... 10

*Ballard* v. *United States*, 329 U.S. 187, 193, 91 L. Ed. 181, 67 S. Ct. 261 (1946) ..................... 11

*Baur v. Veneman*, 352 F.3d 625 (2nd Cir. 2003)........................................................................ 23

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887 (2d Cir. 2015) .................................. 23

*Bostock v. Clayton Cty.*, 140 S.Ct. 1731 (2020) .................................................................. passim

*Bowen v. City of New York*, 476 U.S. 467 (1986)....................................................................... 26

*Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*, 290 F.R.D. 409 (S.D.N.Y. 2012)
.................................................................................................................................................. 24

*Cahill v. Rosa*, 89 N.Y.2d 14, 19-20 (1996) ............................................................................. 20

*Califano v. Webster*, 430 U.S. 313, 320, 51 L. Ed. 2d 360, 97 S. Ct. 1192 (1977) ..................... 12

*California Fed. Sav. & Loan Assn. v. Guerra*, 479 U.S. 272, 289, 93 L. Ed. 2d 613, 107 S. Ct.
683 (1987)............................................................................................................................... 12

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432,42 (1985)............................................... 8

*Coronel v. Decker*, 449 F. Supp. 3d 274 (S.D.N.Y. 2020) ......................................................... 26

*D.N. v. DeSantis*, No. 21-cv-61344-ALTMAN/Hunt, 2023 U.S. Dist. (S.D. Fla. Nov. 6, 2023) 10,
21, 22

*Doe v. Horne* Amicus Brief, Quoting *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 104
(4th Cir. 2011).......................................................................................................................... 8

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................................................... 25

*Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000) .............................................................. 23

*Friends of the Earth, Inc. v. Gaston Copper Recycl. Corp.*, 204 F.3d 149, 160 (4th Cir. 2000).. 24

*Goesaert*, 335 U.S. at 467 ........................................................................................................ 12

*Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997)................. 25

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 73 (2d Cir 1979) ...................... 25

*Kelley v. Bd. of Trs.*, 35 F.3d 265, 272 (7th Cir. 1994)............................................................... 8

*L.W. v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023).............................................................. 8, 19

*Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n,* 965 F.2d 1224 (2d Cir.
1992) ...................................................................................................................................... 23

*Lopez v. City of New York,* 2009 U.S. Dist. LEXIS 7645, *40 (S.D.N.Y. 2009) ........................ 24

*Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313–14 (1976)................................. 8

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275 at 295 .................... 7

*Mitchell v. Cuomo*, 748 F.2d at 806 (2d Cir. 1984) .............................................................. 23, 25

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656,
666 (1993)............................................................................................................................... 14

*New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013).................................. 26

*New York v. Sullivan*, 906 F.2d 910 (S.D.N.Y. 1990) ............................................................... 26

*New York. v. Heckler*, 742 F.2d 729 (2d Cir. 1984) .................................................................. 26

*O'Neil v. Bebee,* 2010 U.S. Dist. LEXIS 11639, * 29 (N.D.N.Y. 2010)..................................... 24

*Obergefell v. Hodges*, 576 U.S. 644 .......................................................................................... 8

*Ondo v. City of Cleveland,* 795 F.3d 597, 609 (6th Cir. 2015)..................................................... 8

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308 (S.D.N.Y. 2018)............................................................................................ 26

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 239, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)..... 9

*Rural & Migrant Ministry v. United States EPA*, 510 F. Supp. 3d 138 (S.D.N.Y. 2020) ............ 24

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28–29 ..................................................... 8

*Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328 (2d Cir. 1995)....................................................... 26

*Soule ex rel. Stanescu v. Conn. Ass'n of Sch. Inc.*, 57 F.4th 43, 56 (2d Cir. 2022) ........ 8, 9, 10, 13

*United States v. Thomas,* 628 F.3d.64, 70-71 (2d Cir. 2010) ....................................................... 25

*United States v. Virginia*, 518 U.S. 515, 533 (1996) .............................................................. 7, 12

## Statutes

20 USC §1681 (i.e., Title IX) .......................................................................................................... 7

34 C.F.R. § 106.41 ........................................................................................................................... 9

Executive Law § 296 [2] [a] .......................................................................................................... 20

## Other Authorities

11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948 ......................................... 23

Nassau County Executive Order Number 2-2024 ................................................................. passim

## Constitutional Provisions

US Const. 14th Amend, § 1 .............................................................................................................. 7

## Articles and Online Sources

Alec Schemmel, Trans student exposed girls to male genetalia in school locker room, legal group claims, ABC 15 News, Crisis in the Classroom, https://wpde.com/news/nation-world/after-trans-woman-exposed-genitalia-to-freshman-girls-in-locker-room-shower-school-district-faces-legal-scrutiny (last visited March 6, 2024).................................................................... 17

*Connecticut track athlete sues state over transgender policy: 'Women's sports are being robbed'*, Fox News, September 30, 2022, https://www.foxnews.com/media/connecticut-track-athlete-sues-state-transgender-policy-womens-sports-being-robbed (last accessed on March 4, 2024) ..................................................................................................................................... 18

*Discrimination against women in sports: Yes, it's still happening*, GOALFIVE, January 25, 2022, https://goalfive.com/blogs/news/discrimination-against-women-in-sports (last accessed on March 5, 2024).......................................................................................................................... 22

*Female swimmer who tied Lia Thomas slams transgender sports policy: Taking women 'back to the 1970s'*, FOX NEWS, December 30, 2022, https://www.foxnews.com/media/female-swimmer-tied-lia-thomas-slams-transgender-sports-policy-women-back-1970s (last accessed on March 4, 2024)................................................................................................................... 15

Heather, Alison K. "Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology." *International journal of environmental research and public health* vol. 19,15 9103. 26 Jul. 2022, doi:10.3390/ijerph19159103 (available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9331831/)................................................... 18

https://iwlc.org/wp-content/uploads/2023/09/FINAL-Doe-v.-Horne-IWF-amicus-.pdf (last accessed on March 5, 2024)......................................................................................................... 8

Jennifer C. Braceras, et al., *Competition: Title IX, Male-Bodied Athletes, and the Threat to Women's [**66] Sports*, Indep. Women's F. & Indep. Women's L. Ctr. 20 (2021) ............... 11

Kristna Watrobski, *Lia Thomas Exposed 'male genitalia' in women's locker room at swim meet, ex-swimmer says*, ABC 7, The National Desk, https://katv.com/news/nation-world/lia-thomas-

exposed-male-genitalia-in-womens-locker-room-at-swim-meet-ex-swimmer-says (last visited March 6, 2024) .................................................................................................................. 16

*NCAA volleyball player refuses to stay silent as trans athletes put women's opportunities 'at risk'*, Fox Business, December 19, 2023, https://www.foxbusiness.com/media/ncaa-volleyball-player-refuses-stay-silent-trans-athletes-women-opportunities-risk (last accessed March 5, 2024) ...................................................................................................................................... 18

*Save Women's Sports Riely Gaines University of Kentucky*, Independent Women's Forum, https://www.iwf.org/save-womens-sports-riley-gaines/ (last visited March 6, 2024) ............. 15

*School stands by trans basketball player accused of hurting opposing girls, blasts 'harmful' criticism*, N.Y. POST, February 28, 2024, https://nypost.com/2024/02/28/sports/school-stands-by-trans-basketball-player-accused-of-hurting-opposing-girls-blasts-harmful-criticism/ (last accessed March 6, 2024) .................................................................................................... 20

*The Role of Testosterone in Athletic Performance*, Duke Ctr. for Sports L. & Pol'y 1 (Jan. 2019) ...................................................................................................................................... 11

## Secondary Sources

H.R.734 — 118th Congress (2023-2024) .................................................................................. 15

Sarah Parshall Perry, *Once More with Feeling: Department of Education Releases Second Title IX Rule—and Fails Again*, The Heritage Foundation: Edwin Meese III Center For Legal & Judicial Studies, Legal Memorandum No. 338 (Aug. 9, 2023) ............................................... 19

SB 1028 ...................................................................................................................................... 22

## STATEMENT OF FACTS

On February 22, 2024, Nassau County Executive Bruce A. Blakeman signed and enacted Nassau County Executive Order Number 2-2024 (EO #2-2024). The purpose of this Executive Order is to ensure that only biological females are permitted to play in designated girls' and women's sports, protecting fairness, equality, and safety in women's sports, while at the same time ensuring that men and transgender athletes are provided an opportunity to perform in designated events.

On March 1, 2024, New York State Attorney General Letitia James ("AG James") served a pre-litigation Cease and Desist Notification on the Office of the Nassau County Executive (the "AG Notice"). In the AG Notice, AG James claims that Executive Order 2-2024 is in violation of New York State anti-discrimination laws. AG James threatened eminent "further legal action" if the Order is not rescinded immediately within five (5) business days. The cease and desist notice further demanded the production of certain documents associated with the drafting and signing of the Executive Order.

The Office of the Nassau County Attorney, on behalf of County Executive Blakeman and Nassau County, respectfully requests the Court grant our request for an injunction, staying AG James' demand for document production, preventing her from taking further legal action and declaring Executive Order Number 2-2024 valid under the U.S. Constitution, Federal Law and State Law.

<u>**REQUEST FOR INJUNCTIVE RELIEF**</u>
<u>**EXECUTIVE ORDER 2-2024 IS NOT DISCRIMINATORY**</u>

County Executive Blakeman and the County of Nassau respectfully request that the Court grant an injunction against Attorney General James, preventing her from taking further legal action against County Executive Blakeman or the County of Nassau.

The Attorney General's Cease and Desist Notification claims that Executive Order 2-2024 is in violation of New York State anti-discrimination laws. It states, *inter alia*, that "[u]nder New York law, it is illegal to discriminate against an individual based on their sex or gender identity or expression. In addition to violating basic civil and human rights, the executive order will impose undue increased scrutiny on women's and girls' teams and leagues and will also subject all athletes on women's and girls' sports teams to intrusive and invasive questioning and other verification requirements."

However, this view on anti-discrimination laws is erroneous. Executive Order 2-2024 is not discriminatory; it protects biological females by ensuring that women and girls are safe and protected while playing sports. Women are a protected class under the United States Constitution and they must be treated as such. The Order ensures women and girls get the same opportunities as males, which requires them to be separated from biological males in sports.

Additionally, the Attorney General's claims are baseless for multiple reasons:

(1) No permit has been denied since the County Executive's Executive Order was executed;

(2) The implementation of the Executive Order requires those applying for a permit, for the purpose of hosting a "sporting competition", merely to indicate whether said competition is male, female, or coed and to supply a copy of the applicants "athlete participation policy";

(3) The Executive Order does not request any personal information from any individual competitor;

(4) The definition of male or female on a birth certificate is merely intended to be guidance to the Parks Department and for those applicants applying to for a permit to ascertain whether the permit shall be issued as a "male", "female", or "coed" sporting competition permit; and

(5) The classification that is being made under the Executive Order is a permissible classification for the purpose of providing equal opportunity and access to women in sports and does not preclude any person on the basis of "sex, gender, or expression" from utilization of Nassau County facilities.

In short, the Executive Order does not refuse or prohibit transgender females from playing sports in Nassau County but rather provides for and protects a level playing field for all.

## CLASSIFICATION BASED ON SEX IS PERMISSIBLE UNDER EQUAL PROTECTION

Athletic competition is an area where a classification based on sex is permissible under equal protection. See US Const. 14th Amend, § 1; *United States v. Virginia*, 518 U.S. 515, 533 (1996) (For a gender-based classification to satisfy equal protection under the intermediate-scrutiny test, the government "must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."); see also 20 USC §1681 (i.e., Title IX).

Not only is it permissible, but it is necessary and logical. The purpose of Title IX is to remedy previous discrimination against girls and women in sports, and give them the same athletic opportunities that were presented to men.[1] "Title IX requires that schools provide girls with the same 'chance to be champions' they provide boys." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275 at 295.[2] After all of the years of fighting to be afforded the same

---

[1] While Title IX is not applicable to Nassau County as it is not considered an educational institution it is instructive.
[2] See *https://iwlc.org/wp-content/uploads/2023/09/FINAL-Doe-v.-Horne-IWF-amicus-.pdf* (last accessed on March 5, 2024).

opportunities, women should not have to compete with biological men to earn spots on a team roster, win trophies or titles, earn scholarships, earn playing time on the field, etc., all meant for *women*. *Id*. The provisions of Title IX's creating classifications for men's and women's sports teams are based on those differences and are consistently held constitutional because they were designed to "remov[e] the legacy of sexual discrimination—including discrimination in the provision of extra-curricular offerings such as athletics." *Kelley v. Bd. of Trs.*, 35 F.3d 265, 272 (7th Cir. 1994); see also *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 104 (4th Cir. 2011).

Further, the bar for recognizing a new suspect class is a high one. See *L.W. v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023). "The Supreme Court has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so." *Ondo v. City of Cleveland*, 795 F.3d 597, 609 (6th Cir. 2015); *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 42 (1985) (mental disability is not a suspect class); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313–14 (1976) (age is not a suspect class); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28–29 (poverty is not a suspect class); see also *Obergefell v. Hodges*, 576 U.S. 644 (declining to address whether gay individuals qualify as a suspect class); *L.W. v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023).

In anticipation of the Defendants counter arguments, *Bostock v. Clayton Cty.*, 140 S.Ct. 1731 (2020), did not establish that assigning sports teams based on biological sex would constitute discrimination, much less hold that "discrimination based on transgender status is generally prohibited under federal law." *Soule ex rel. Stanescu v. Conn. Ass'n of Sch. Inc.*, 57 F.4th 43, 56 (2d Cir. 2022). *Bostock* held that Title VII prohibits the firing of an employee based on transgender status because such discrimination would amount to discrimination based on biological sex. The

Court explained that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. It offered the hypothetical of "an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" and "the individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* at 1741-42. In reaching its conclusion, the Court accepted the premise that "sex" in Title VII refers "only to biological distinctions between male and female." *Id.* at 1739; *see also Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth."). *Soule*, 90 F.4th at 62-63.

While Title VII makes sex "not relevant to the selection, evaluation, or compensation of employees," *Bostock*, 140 S. Ct. at 1741 (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (plurality opinion)), the Title IX framework expressly allows a funding recipient to maintain separate sports teams based on sex, 34 C.F.R. § 106.41(b), provided that the recipient offers "equal athletic opportunity for members of both sexes," *id.* § 106.41(c).

In other words, "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022) . In fact, the Title IX framework effectively requires a recipient to maintain separate sports teams. Thus, while an employer risks Title VII liability when it makes distinctions among employees based on sex, an education program risks Title IX liability when

it *fails* to distinguish between student athletes based on sex. The division that the plaintiffs propose here—separating teams on the basis of sex—is what the Title IX regulations authorize. *Bostock* does not suggest that Title IX requires separating athletic teams on a different basis. *Soule*, 90 F.4th at 63. Additionally, the County has included a third category for "co-ed" or transgender groups to use County facilities so long as it is disclosed to such participants, so that they may assume the risk of injury that may result in participation in such a category and event.

**BIOLOGY AND SCIENCE SUPPORT**
**NASSAU COUNTY'S EXECUTIVE ORDER**

Physiologically, it is undeniable that males and females are different. Even transgender males and transgender females are unable to alter their DNA post-transition. Additionally, bone density, bone mass, bone structure, and length differ in male and females. These are innate differences that do not disappear after altering hormones or genitalia. These inherent differences are what make it dangerous for transgender females to compete against and with biological females.

In *D.N. v. DeSantis*, the U.S. District Court for the Southern District of Florida noted and acknowledged the biological differences between men and women several times in its opinion. "While some females may be able to outperform some males, it is generally accepted that, on average, males outperform females athletically because of inherent physical differences between the sexes. This is not an overbroad generalization, but rather a general principle that realistically reflects the average physical differences between the sexes." *D.N. v. DeSantis*, No. 21-cv-61344-ALTMAN/Hunt, 2023 U.S. Dist. (S.D. Fla. Nov. 6, 2023) , quoting *B.P.J. v. W. Va. State Bd. of Educ.*, 649 F. Supp. 3d 220.

In *Adams v. Sch. Bd. Of St. Johns Cnty.*, the United States Court of Appeals for the Eleventh Circuit spoke about these biological differences: "While pre-puberty physical differences that

affect athletic performance are "not unequivocally negligible" between males and females, measurable physical differences between males and females develop during puberty that significantly impact athletic performance." *Adams v. Sch. Bd. Of St. Johns Cnty*, 57 F.4th 791 (11th Cir. 2022). They go on to cite various sources that detail specific, concrete differences between the two sexes: "For example, in comparison to biological females, biological males have: "greater lean body mass," i.e., "more skeletal muscle and less fat"; "larger hearts," "both in absolute terms and scaled to lean body mass"; "higher cardiac outputs"; "larger hemoglobin mass"; larger maximal oxygen consumption (VO2 max), "both in absolute terms and scaled to lean body mass"; "greater glycogen utilization"; "higher anaerobic capacity"; and "different economy of motion.""[3]

These physical differences cut directly to the "main physical attributes that contribute to elite athletic performance," as recognized by sports science and sports medicine experts. *Id.* In tangible performance terms, studies have shown that these physical differences allow post-pubescent males to "jump (25%) higher than females, throw (25%) further than females, run (11%) faster than females, and accelerate (20%) faster than females" on average. *See* Jennifer C. Braceras, et al., *Competition: Title IX, Male-Bodied Athletes, and the Threat to Women's Sports*, Indep. Women's F. & Indep. Women's L. Ctr. 20 (2021)." *Id.* at 819-820. Physical differences between men and women are enduring: "The two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." *Ballard* v. *United States*, 329 U.S. 187, 193 (1946).

"Inherent differences between men and women, we have come to appreciate, remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on

---

[3] *The Role of Testosterone in Athletic Performance*, Duke Ctr. for Sports L. & Pol'y 1 (Jan. 2019).

an individual's opportunity. Sex classifications may be used to compensate women 'for particular economic disabilities [they have] suffered,' *Califano v. Webster*, 430 U.S. 313, 320 (1977) (per curiam), to 'promote equal employment opportunity,' *see California Fed. Sav. & Loan Assn. v. Guerra*, 479 U.S. 272, 289 (1987), to advance full development of the talent and capacities of our Nation's people. But such classifications may not be used, as they once were, *see e.g. Goesaert*, 335 U.S. at 467, to create or perpetuate the legal, social, and economic inferiority of women." *United States v. Virginia*, 518 U.S. 515, 533-534 (1996)).

In *Doe v. Horne*, the amicus further elaborated on biological differences, stating "[t]he district court also ignored evidence that female bodies have distinct and significant athletic disadvantages that biological males cannot create for themselves. For example, female athletes "must typically deal with the effects of the menstrual cycle and the cyclical effects of hormones on training capacity and performance," which is "known to affect cardiovascular, respiratory, brain function, response to ergogenic aids, orthopedics, and metabolic parameters." That is a "barrier to athletic capacity not experienced by males—even those like Plaintiffs who take puberty blockers. For these and other reasons, even biological males who never experience male puberty are likely to have an athletic advantage over females". *Doe v. Horne* Amicus Brief.[4]

The above-cited amicus brief also highlights the important distinction between employment discrimination (discussed in *Bostock*) and men's/women's sports. The *Bostock* court made clear, "[a]n individual employee's sex is not relevant to the selection, evaluation, or compensation of employees." *Bostock* 140 S.Ct. at 1741. "In other words, *Bostock* adopts a but-for test, whereby an employer who would not have fired an employee for presenting at work as a woman but for the fact that the employee was born male, has discriminated in violation of Title

---

[4] *See* fn. 1.

VII." *Id.* at 1739. But while an individual's "sex is not relevant to the selection, evaluation, or compensation of employees," it is highly relevant to athletics. In fact, it is often dispositive." *Doe v. Horne* Amicus Brief. Men and women are *not* similarly situated. The two sexes have different physical structure, bone mass and development, physiological capabilities, etc. Therefore, *Bostock* is not the appropriate case to be applied in situations relating to sports, where physical differences between the two genders *matter*.

The importance of fairness in sports is further illustrated by the organization of sports such as wrestling and boxing, which have separate weight classifications. In men's wrestling, there are different weight classification to ensure that men are only competing against men of similar weight and mass. The same is true for men's boxing. Common sense tells us that this is to protect the athletes and maintain a safe and fair sport. If a man wrestled or boxed against a man several weight classes heavier than him, this would not only be unfair, but also dangerous. These classifications limit which athletes can compete in which class, but we wouldn't consider this a discriminatory practice. Similarly, Executive Order 2-2024 does not contain discriminatory practices by simply separating biological males from biological females for purposes of equity and safety.

In a similar case, the plaintiffs were "high school girls who compete[d] in interscholastic girls' track and field,' each of whom "trained much of her life—striving to shave mere fractions of seconds off her race times—in order to experience the personal satisfaction of victory, gain opportunities to participate in state and regional meets, gain access to opportunities to be recruited and offered athletic scholarships by colleges, and more. "According to the complaint, the girls' "personal and attainable goals of victory" were "taken from them" when they were "forced to compete against males with inherent physiological advantages in the girls' category." *Soule*, 90 F.4th at 56.

Indeed, the denial of an equal opportunity to compete is an injury whether or not the plaintiffs could show that the outcome of any particular race would have been different under nondiscriminatory conditions. See *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) ("The injury in cases of this kind is that a discriminatory classification prevents the plaintiff from competing on an equal footing.") (internal quotation marks and alteration omitted); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("The 'injury in fact' ... is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) (identifying the injury as "the opportunity to play for a team that can qualify for the Regional and State Championships" rather than obtaining such qualification). *Soule*, 90 F.4th at 56.

The biological differences between men and women highlight why Executive Order 2-2024 is of utmost importance to the safety and fairness of girls and women in sports. The Executive Order is proper, and further legal action taken to challenge this Order should be prohibited.

### NASSAU COUNTY BELIEVES IN MAINTAINING A LEVEL PLAYING FIELD FOR ALL WOMEN INVOLVED IN SPORTS AND TO PREVENT FURTHER PHYSICAL AND EMOTIONAL DAMAGE

In April of 2023, the Protection of Women and Girls in Sports Act was adopted by the House of Representatives. While not adopted into law, the bill's legislative intent is nevertheless instructive:

> "Girls deserve equal opportunity to compete and achieve in sports. The Biden administration's reinterpretation of Title IX is a slap in the face to young women and girls, telling them their hard work, on-field achievements, and athletic futures do not matter. Title IX was designed to stop discrimination and ensure equal athletic opportunities for women. By allowing biological males to compete in girls' sports the Biden administration will be reversing 50 years of progress for women. H.R. 734, the Protection of Women and Girls in Sports Act of 2023 strengthens the law's existing protections for women, ensures a level playing field for female athletes, and protects the law from the Biden administration's radical regulatory scheme."

H.R.734 — 118th Congress (2023-2024).

Similarly, the Executive Order in this case aims to protect women and all of their hard work and athletic achievements. It intends to maintain a level playing field for all women involved in sports in Nassau County. Former Collegiate female swimmer Riley Gaines stated that allowing transgender females to compete with biological females is "turning back the clock on Title IX and women's rights and is anything but progressive."[5]  Riley Gaines' passion and dedication to swimming started when she was just a child.[6]  When she was about twelve, she started breaking swimming records. She went on to swim for her high school swim team and from there, swam for the Kentucky Women's Swim Team. In college, Gaines swam against UPenn's Lia Thomas, a transgender female, who has since won a national title as the fastest female swimmer in the country.  Gaines and Thomas ended up tying for 5th place, however, *only* Thomas stood on the podium to receive the trophy that day—Gaines did not, despite earning her place. Gaines expressed how she and other female swimmers felt about having to compete against Thomas: "I remember

---

[5] *Female swimmer who tied Lia Thomas slams transgender sports policy: Taking women 'back to the 1970s'*, Fox News, December 30, 2022, https://www.foxnews.com/media/female-swimmer-tied-lia-thomas-slams-transgender-sports-policy-women-back-1970s (last accessed on March 4, 2024).
[6] See: *Save Women's Sports Riely Gaines University of Kentucky*, Independent Women's Forum, https://www.iwf.org/save-womens-sports-riley-gaines/ (last visited March 6, 2024).

watching it, and [Lia] destroyed everyone," Gaines said. "I was standing right next to the girl who placed 17th, which means she didn't make it to the final or get to be All-American, when Lia touched the wall. She just looked at me and had tears in her eyes and she told me, 'I just got beat by someone who probably didn't have to try this morning." When Thomas competed as a male swimmer before her transition, he was ranked in "the 500s at best", according to Gaines. "Other women lost opportunities to compete and receive medals, including… 9th place finisher Tylor Mathieu who was likewise excluded from the final and thus prevented from becoming an All-American." *Doe v. Horne* Amicus Brief.[7]

This is a perfect example of how absolutely devastating the consequences can be for athletes like Riley Gaines who have trained their whole lives for these competitions. Gaines and other swimmers have been unfairly beaten in women's swimming by a biological male, someone who is naturally much faster and stronger than they are.

Gaines also brought up another real issue women in sports are facing: discomfort and vulnerability in the locker room. Gaines stated that being exposed to Thomas' male genitalia in the locker room made her extremely uncomfortable. "We did not give our consent, they did not ask for our consent, but in that locker room, we turn around and there's a 6'4" biological man dropping his pants and watching us undress, and we're exposed to male genitalia."[8] Gaines mentioned another valid point—that just a few years ago, this act would have been considered voyeurism, indecent exposure, or potentially another sexual offense. The risk of exposure poses another major safety risk to female athletes, especially young girls participating in middle school and high school sports. A similar incident happened to four high school girls, aged 14, when they

---

[7] *See* fn. 1.
[8] Kristna Watrobski, *Lia Thomas Exposed 'male genitalia' in women's locker room at swim meet, ex-swimmer says*, ABC 7, The National Desk, https://katv.com/news/nation-world/lia-thomas-exposed-male-genitalia-in-womens-locker-room-at-swim-meet-ex-swimmer-says (last visited March 6, 2024).

were showering in their school's locker room. After their physical education class, the girls entered the locker room to shower, and noticed a biological male in the room, who they understood to be transgender. The biological male was 18 years old at the time of this incident. As the girls were in the shower in the locker room, the male student approached them, stated, "I'm trans, by the way", and proceeded to completely undress and enter the showers with the girls. His male genitalia was fully exposed to the 14 year old girls as he showered. The girls were uncomfortable, shocked, and left the showers as soon as they could. Although the incident should have been reported as sexual harassment under Title IX, the assistant principal failed to do so. This left the girls without the opportunity to immediately file a complaint or seek supportive measures.[9] These incidents have lasting, traumatizing effects on young women. It is inappropriate and unsafe, and that is yet another reason why the Executive Order is appropriate.

Collegiate sports scholarships are also at issue if we allow transgender females to compete in biological women's sports. This raises the potential for a very slippery slope-- potentially completely eliminating women and girls completely from earning women's sports scholarships. NCAA volleyball athlete Macy Petty stated in an interview for Fox Business that if the NCAA does not prohibit transgender females from occupying a female scholarship spot, it will be detrimental for biological female athletes. On the issue Petty said, "There's a lot of money in sports and these coaches, their jobs are dependent on them winning. So, if there's no rules from the NCAA saying that it has to be a female that occupies this female scholarship spot, then they're going to go out and recruit whoever's going to win. Unfortunately, because of biological

---

[9] Alec Schemmel, Trans student exposed girls to male genitalia in school locker room, legal group claims, ABC 15 News, Crisis in the Classroom, https://wpde.com/news/nation-world/after-trans-woman-exposed-genitalia-to-freshman-girls-in-locker-room-shower-school-district-faces-legal-scrutiny (last visited March 6, 2024).

advantages, they're going to go out and recruit men now."[10]  The point is a valid one that puts forth a potentially scary reality of all biological women's sports scholarships being awarded to their stronger, better, faster competitors: biological males.

This is more than just an abstract possibility, however.  For Selina Soule, a track runner from Connecticut, it was a very devastating reality.  When interviewed by Fox News host Todd Piro, Soule explained how devastating it was to lose over and over again to biological males. She said she lost out on "qualifying spots for the meets, better placement and possibly even scholarship opportunities".  She called the experience "frustrating and heartbreaking."[11]

Martina Navratilova, who has won eighteen Gland Slam Tennis singles titles has said "sex segregation is the only way to achieve equality for girls and women." *Doe v. Horne* Amicus Brief. "Without their own teams, female students simply will not have the same opportunities as male students to participate in athletics, as required by Title IX of the Education Amendments of 1972." *Id.*

With respect to the issuance of park permits for hosting of sporting events and competitions, the classification serves the objective of providing Women and Girls opportunities to compete in sports that allow Women and Girls to demonstrate their strength, and athletic abilities and to provide them with fair and equal opportunities to obtain recognition and accolades, college scholarships, and numerous other long-term benefits that result from participating and competing in athletic endeavors.[12]

---

[10] *NCAA volleyball player refuses to stay silent as trans athletes put women's opportunities 'at risk'*, Fox Business, December 19, 2023, https://www.foxbusiness.com/media/ncaa-volleyball-player-refuses-stay-silent-trans-athletes-women-opportunities-risk (last accessed March 5, 2024).

[11] *Connecticut track athlete sues state over transgender policy: 'Women's sports are being robbed'*, Fox News, September 30, 2022, https://www.foxnews.com/media/connecticut-track-athlete-sues-state-transgender-policy-womens-sports-being-robbed (last accessed on March 4, 2024).

[12] Heather, Alison K. "Transwoman Elite Athletes: Their Extra Percentage Relative to Female Physiology." *International journal of environmental research and public health* vol. 19,15 9103. 26 Jul. 2022, doi:10.3390/ijerph19159103 (available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9331831/).

**THE LAW THAT THE NYS ATTORNEY GENERAL SEEKS TO ENFORCE IS VAGUE, OVERBROAD, AND THE ATTORNEY GENERAL'S INTERPRETATION RUNS CONTRARY TO FEDERAL EQUAL PROTECTION LAW AND FEDERAL STATUTE**

The law that the Attorney General seeks to enforce, and purports that Executive Order 2-2024 violates, is vague since the law fails to define "sex or gender identity or expression." In other words, it is unclear based on the language of the New York statute what classifications, if any, are permissible under "sex" or "gender identity" or "expression" or how such a rule can be followed except to eliminate all indica of sex, gender identity, or expression in all public spaces. The Attorney General suggests that even if there were a vitally important goal seeking to be achieved by substantially related means, as presented in Executive Order 2-2024, that no classification on the basis of sex, gender expression, or gender identity would be permissible. Such interpretation flies in the face of the U.S Constitution, Federal Law, juris prudence and reality. See *L.W. v. Skrmetti*, 83 F.4th 460, 486 (6th Circ. 2023) ([N]either the Supreme Court nor this Court has recognized transgender status as a suspect class. Until that changes, rational basis review applies).

The Attorney General highlights the definition provided for in the Executive Order as impermissible, however, the Executive Order does not require the County of Nassau to request or obtain any specific individual to provide a copy of their birth certificate or ask for any individual athlete's personal information as a condition precent to the issuance of a park permit.

A Hobson's Choice Emerges. The County of Nassau, subject to the Attorney General's interpretation, can: either (1) be sued by the State of New York for keeping girls and women's sports separated by sex; or (2) subject the County of Nassau to the risk of substantial personal injury judgments by allowing participation on women's athletic teams based on gender identity.[13]

---

[13]*See* Sarah Parshall Perry, *Once More with Feeling: Department of Education Releases Second Title IX Rule—and Fails Again*, The Heritage Foundation: Edwin Meese III Center For Legal & Judicial Studies, Legal Memorandum No. 338 (Aug. 9, 2023).

However, the County of Nassau is obligated to ensure safety at its parks and facilities, including foreseeing any dangers that may arise and give rise to legal liability and lawsuits if injuries occur. In this case, failure to protect biological females can and will lead to injury (as outlined elsewhere in this memorandum), which leaves the County of Nassau exposed and liable for injuries occurring at our facilities. Executive Order 2-2024 allows the County of Nassau to ensure that women and girls' sports are played safely and fairly.

By way of example, just last month in Massachusetts, KIPP Academy High School allowed a transgender female to play basketball against the Collegiate School of Lowell's girls basketball team. This transgender female injured three female players in only half of the basketball game. Publicly available video depicts the injury of one of the female players.[14] Lowell's coach decided to forfeit the game at halftime, instead of risking injury to more players. This is just one example of how detrimental it can be to allow players of the opposite sex that are stronger, heavier and faster, to compete in women's sports.

It should also be understood that Executive Order 2-2024 allows transgender females the opportunity to play in men's sports and co-ed sports. It does not in any way prohibit them from playing sports in general. "The Human Rights Law (Executive Law Art. 15) provides that it shall be "an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the … disability… of any person … to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof" (Executive Law § 296 [2] [a] [emphasis added])." *Cahill v. Rosa*, 89 N.Y.2d 14, 19-20 (1996).

---

[14] *School stands by trans basketball player accused of hurting opposing girls, blasts 'harmful' criticism*, N.Y. POST, February 28, 2024, https://nypost.com/2024/02/28/sports/school-stands-by-trans-basketball-player-accused-of-hurting-opposing-girls-blasts-harmful-criticism/ (last accessed March 6, 2024).

The Executive Order does not refuse or prohibit transgender females from playing sports in Nassau County but rather provides for and protects a level playing field for all.

**FEDERAL COURTS HAVE SUPPORTED
THE COUNTY'S POSITION**

In the U.S. District Court for the Southern District of Florida, the Plaintiff (D.N.) was a teenage biological male that identified as a female since she was very young. *D.N. v. DeSantis*, No. 21-cv-61344-ALTMAN/Hunt, 2023 U.S. Dist. (S.D. Fla. Nov. 6, 2023) . The teenager started taking hormone blockers at age eleven and started taking estrogen. *Id*. D.N. played basketball and softball at a young age, and in middle school she played on multiple soccer teams. *Id*. In high school, at the time D.N. brought the suit, she played soccer and volleyball. *Id*. Plaintiff brought suit asserting that the Fairness in Women's Sports Act, signed into law by Governor Ron DeSantis in 2021, violated her due process right of privacy and deprived her of equal protection. *Id*. The defendants filed a motion to dismiss. *Id*. The Court granted defendants' motion to dismiss in its entirety, with leave for Plaintiff to file an amended complaint. *Id*.

The Court reasoned in its analysis that "we disagree that the statute comes anywhere close to creating the sort of caste-like system the Constitution forbids—a system in which transgender girls are legally demeaned and degraded because of their gender identity. The statute, after all, only applies in one very discrete scenario—where a biological boy (whether transgender or not) wants to play on the girls' sports team of a public school. And, far from singling out transgender girls for special treatment, the law applies equally to the (almost) fifty percent of the population who are born as biological boys—and who don't transition." *Id*.

The Court went on to differentiate between this type of Bill and the kinds of laws the Equal Protection Clause unquestionably forbids. Forbidden laws would be "laws that, for instance, prohibited black Americans from eating at the same restaurants, drinking from the same water

fountains, attending the same schools, and swimming in the same beaches as white Americans. Those laws—untethered from any legitimate governmental interest—degraded blacks (because of their race) across broad swathes of American social life. SB 1028 (it goes without saying) does nothing of the sort: It doesn't, in other words, prevent transgender girls from eating at the same restaurants, drinking from the same water fountains, attending the same schools, or swimming in the same beaches as cisgender girls (or cisgender boys)." *D.N. v. DeSantis*, No. 21-cv-61344-ALTMAN/Hunt, 2023 U.S. Dist. (S.D. Fla. Nov. 6, 2023)

The same can be said for Executive Order 2-2024. This Order does not create a system that demeans or degrades transgender women because of their identity. This order allows biological men to play on men's sports teams, as well as co-ed sports teams. This was also a factor that the Court in *D.N. v. DeSantis* considered. Executive Order 2-2024 does not deny transgender females equal protection of any laws.

Historically, men have received greater recognition in sports and have had more sports available to them, especially in the world of professional sports. Women have worked tirelessly to differentiate themselves and gain recognition as female athletes. Female sports have made huge progress since the 1920's, when the International Women's Sports Federation was founded. If we allow biological men to start competing with biological females, it erases all of the hard-earned progress and more importantly, creates a dangerous environment for those females to play in. Historically, Women and Girls receive "fewer athletic opportunities, scholarships, and funds."[15]

---

[15] *Discrimination against women in sports: Yes, it's still happening*, GOALFIVE, January 25, 2022, https://goalfive.com/blogs/news/discrimination-against-women-in-sports (last accessed on March 5, 2024).

## ARGUMENTS IN SUPPORT OF A TEMPORARY RESTRAINING ORDER

In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n,* 965 F.2d 1224, 1228 (2d Cir. 1992) (the "standards which govern consideration of an application for a temporary restraining order ... are the same standards as those which govern a preliminary injunction").

To obtain a preliminary injunction, a plaintiff must establish: (1) "a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) "a likelihood of irreparable injury in the absence of an injunction"; (3) that the balance of hardships "tips in the plaintiff's favor"; and (4) that the injunction is not adverse to the public interest. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotations omitted). In general, where a complaint alleges the denial of a constitutional right, irreparable harm will be presumed. *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (*citing* 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2948).

Plaintiffs easily satisfies these factors here.

An increased risk of future physical injury confers standing in an action challenging a government policy. *See*, *e.g.*, *Friends of the Earth v. Laidlaw*, 528 U.S. 167 (2000); *Baur v. Veneman*, 352 F.3d 625 (2nd Cir. 2003). As the Fourth Circuit stated in *Friends of the Earth*:

> "By producing evidence that Gaston Copper is polluting Shealy's nearby water source, CLEAN has shown an increased risk to its member's downstream uses. This threatened injury is sufficient to provide injury in fact. Shealy need not wait until his lake becomes barren and sterile or assumes an unpleasant odor and smell before he can invoke the protections of the Clean Water Act. Such a novel demand would eliminate the claims of those who are directly

> threatened but not yet engulfed by an unlawful discharge. Article III
> does not bar such concrete disputes from court."

*Friends of the Earth, Inc. v. Gaston Copper Recycl. Corp.*, 204 F.3d 149, 160 (4th Cir. 2000).

The interests the County seeks to protect are unquestionably germane to its mission to promote equal protection under the law and to advocate for individuals and because the complaint seeks a declaratory and injunctive relief, not compensatory damages, the participation of individual members in the lawsuit is not required. *Rural & Migrant Ministry v. United States EPA*, 510 F. Supp. 3d 138, 155 (S.D.N.Y. 2020); *Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416 (S.D.N.Y. 2012). Nevertheless, the Mullens are individual plaintiffs who are able to demonstrate the harmful effects of transgender participation in their daughter's sport.

## STANDARD OF REVIEW

"As [Defendant] points to no court decision that has found transgender individuals a protected class for the purposes of Fourteenth Amendment analysis, and the Court has found none, her claims that she was subject to discrimination based on her status as transgender are subject to rational basis review." *See Lopez v. City of New York,* 2009 U.S. Dist. LEXIS 7645, *40 (S.D.N.Y. 2009).

The Court further reasoned that, "several rational bases, ranging from desire to maintain order in prisons through having uniforms to disallowing plaintiff from signaling female sexuality in a male prison readily come to mind." *See Id.*

## LIKELIHOOD OF SUCCESS

"To survive [rational] scrutiny, the alleged classification need only be 'rationally related to a legitimate state interest.'" *See O'Neil v. Bebee,* 2010 U.S. Dist. LEXIS 11639, * 29 (N.D.N.Y. 2010). "[Rational scrutiny] standard confers on the challenged classification a strong presumption of validity and places the burden on the person attacking its rationality to negative every

conceivable basis which might support it." *See United States v. Thomas,* 628 F.3d.64, 70-71 (2d Cir. 2010).

County Executive Bruce Blakeman has a legitimate interest in ensuring that biological females are protected and given fair opportunities when it comes to sports. Sports involves physical competition on and/or off the field. In addition, certain sports involve the use of locker rooms before, during, and/or after competition. County Executive Bruce Blakeman has a legitimate state interest in ensuring that, biological females are not subjected to and/or exposed to biological male genitalia.

## **IRREPARABLE HARM**

The AG Notice directive poses immediate and actual irreparable injury to Plaintiffs. In general, where a complaint alleges the denial of a constitutional right, irreparable harm will be presumed. *Mitchell v. Cuomo*, 748 F.2d at 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary").

That is certainly the case here, where the NYS AG is effectively seeking to deprive Plaintiffs their constitutional right to equal protection. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the deprivation of constitutional rights "for even minimal periods of time, unquestionably constitutes irreparable harm").

Further, as its name suggests, an irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate. *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 73 (2d Cir 1979). A substantial risk of serious illness or death has often been found to constitute irreparable harm. *See*, *e.g.*, *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 43-44 (2d Cir. 1997) (finding irreparable harm where the closure of a treatment program would

pose serious risk of harm to plaintiffs, including "death, illness or disability"); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332-33 (2d Cir. 1995) (upholding District Court's irreparable harm finding based on the "risk of injury, infection, and humiliation"); *see also New York. v. Heckler*, 742 F.2d 729, 736 (2d Cir. 1984) (harm is irreparable if many members of the class would likely suffer "a severe medical setback" as a result of the challenged requirement), *aff'd sub nom. Bowen v. City of New York*, 476 U.S. 467 (1986); *New York v. Sullivan*, 906 F.2d 910, 918 (S.D.N.Y. 1990) (a claim of irreparable harm exists where a challenged requirement "potentially subject[s] claimants to deteriorating health, and possibly even to death").

## <u>BALANCE OF HARMS AND PUBLIC INTEREST</u>

Where, as here, the government is the opposing party, the final two factors in the temporary restraining order analysis – the balance of the harms and the public interest – merge. *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018). As to the balance of harms, the likelihood of real and immediate irreparable harm to Plaintiff and its members from the failure to grant them interim relief clearly outweighs the likelihood of any harm to Defendants from granting such relief. After all, "securing [Constitutional] rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) ("[T]he public interest is best served by ensuring the constitutional rights of persons within the United States are upheld") (citation omitted).

Indeed, Defendants cannot show that enjoining or preventing the Executive Order and its underlying policy will adversely impact them at all. First, "the Government does not have an interest in the enforcement of an unconstitutional law." *Am. Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003). Next, the injunction sought by Plaintiffs will simply maintain the

status quo which has exists for 50 years after the enactment of Title IX. Accordingly, the balance of harms and the public interest weigh in favor of granting Plaintiffs' motion for a temporary restraining order and preliminary injunction.

## CONCLUSION

For all of the reasons set forth herein, this Court should enter a temporary restraining order and preliminary injunction to enjoin the Defendants from taking further legal action relating to Executive Order No. 2-2024 including, without limitation, enjoining the Defendants from initiating any legal proceedings and/or actions against County Executive Bruce A. Blakeman, the County of Nassau, its agencies, departments and/or employees relating to Executive Order No. 2-2024.

Dated: Mineola, New York
March 7, 2024

**JOHN L. HILLER**
**CHIEF DEPUTY**
**COUNTY ATTORNEY**

By: /s/ *Victoria LaGreca*
Victoria LaGreca
*Deputy County Attorney*
1 West Street, 2nd Floor
Mineola, New York 11501
(516) 571-3056