UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRUCE A. BLAKEMAN, in his capacity as County Executive of the County of Nassau, COUNTY OF NASSAU, MARC MULLEN, as parent and natural guardian of K.E.M., an infant under the age of eighteen years, and JEANINE MULLEN, as parent and natural guardian of K.E.M., an infant under the age of eighteen years, | No. 2:24-cv-01655 |

*Plaintiffs*,

-against-

LETITIA JAMES, as Attorney General of the State of New York, STATE OF NEW YORK OFFICE OF THE ATTORNEY GENERAL, and STATE OF NEW YORK,

*Defendants*.

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Defendants*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL ALLEGATIONS .................................................................................................... 3

LEGAL STANDARD ................................................................................................................ 5

ARGUMENT ............................................................................................................................. 7

   I.    PLAINTIFFS' COMPLAINT SUFFERS FROM SEVERAL INSURMOUNTABLE
   THRESHOLD DEFECTS REQUIRING DISMISSAL ....................................................... 7

      A.   Plaintiffs' Complaint fails to properly invoke subject matter jurisdiction under the
      Declaratory Judgment Act. ........................................................................................... 7

      B.   The Eleventh Amendment bars Plaintiffs' claims against the Office of the Attorney
      General and against the State, and any claim for retroactive relief against the Attorney
      General acting in her official capacity. .......................................................................... 7

      C.   Plaintiffs Blakeman and the County of Nassau lack capacity to assert constitutional
      claims against the State. ................................................................................................. 9

      D.   Plaintiffs Blakeman and Nassau County fail to demonstrate injury sufficient to support
      their standing to bring a pre-enforcement challenge to application of state civil rights laws. .
      ....................................................................................................................................... 13

      E.   The individual plaintiffs lack standing. ...................................................................... 14

      F.   The request for a preemptive injunction against the Attorney General prohibiting
      enforcement of New York law is non-justiciable. ...................................................... 18

   II.   PLAINTIFFS FAIL TO STATE A CLAIM ON THE MERITS ...................................... 21

CONCLUSION ........................................................................................................................ 24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguayo v. Richardson*,
   473 F.2d 1090 (2d Cir. 1973)..............................................................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................6, 24

*Avni v. Pilgrim Psychiatric Ctr.*,
   No. 05 Civ. 5346, 2006 WL 2505241 (E.D.N.Y. Aug. 28, 2006) ...........................................8

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................6

*Bostock v. Clayton County*,
   590 U.S. 644 (2020).................................................................................22

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016)..............................................................................6

*City of Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985).................................................................................21

*City of New York v. Heckler*,
   578 F. Supp. 1109 (E.D.N.Y.) .............................................................................10

*City of New York v. State*,
   86 N.Y.2d 286 (1995) .............................................................................9–11

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013).................................................................................14–15, 17

*Cnty. of Chautauqua v. Shah*,
   126 A.D.3d 1317 (4th Dep't 2015).............................................................................11

*Correspondent Servs. Corp. v. First Equities Corp. of Fla.*,
   442 F.3d 767 (2d Cir. 2006)..............................................................................7

*Davis v. Proud*,
   2 F. Supp. 3d 460 (2d Cir. 2014) ...........................................................................7

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006)................................................................................14

*Ex Parte Young*,
   209 U.S. 123 (1908).............................................................................................8

*Giordani v. U.S. Dep't of Just.*,
   No. 22-cv-642, 2022 WL 17488494, (E.D.N.Y. Dec. 7, 2022)................................8

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020) .............................................................................22

*Hayden v. Cnty. of Nassau*,
   180 F.3d 42 (2d Cir. 1999)...........................................................................21–23

*Hecox v. Little*,
   79 F.4th 1009 (9th Cir. 2023) ............................................................................22

*In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*,
   481 F.2d 122 (9th Cir. 1973) .............................................................................10

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*,
   30 N.Y.3d 377 (2017) ...................................................................................10–11

*John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
   78 F.4th 622 (4th Cir. 2023) .............................................................................15

*Jude v. New York State*,
   No. 07 Civ. 5890, 2009 WL 928134 (S.D.N.Y. Mar. 30, 2009) ......................8, 18

*Knife Rts., Inc. v. Vance*,
   802 F.3d 377 (2d Cir. 2015)..........................................................................13–14

*Lewis v. Lefkowitz*,
   32 Misc. 2d 434 (Sup. Ct. N.Y. 1961) ................................................................19

*Long Island Roller Rebels v. Blakeman*,
   Index No. 604254/2024 (Sup. Ct. Nassau County) .............................................21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).........................................................................................6, 14

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000).................................................................................6

*McGinty v. State of New York,*
   251 F.3d 84 (2d Cir. 2001)..........................................................................7

*Merola v. Cuomo,*
   427 F. Supp. 3d 286 (N.D.N.Y. 2019)......................................................12

*New York by Schneiderman v. Utica City Sch. Dist.,*
   177 F. Supp. 3d 739 (N.D.N.Y. 2016).........................................................2

*Nnebe v. Daus,*
   644 F.3d 147 (2d Cir. 2011)......................................................................13

*Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.,*
   No. 23-1534, 2024 WL 981436 (7th Cir. Mar. 7, 2024)....................14, 17

*Pauk v. Bd. of Trustees of City Univ. of New York,*
   654 F.2d 856 (2d Cir. 1981)........................................................................8

*Personnel Adm'r of Massachusetts v. Feeney,*
   442 U.S. 256 (1979)..................................................................................23

*Pub. Serv. Comm'n of Utah v. Wycoff Co.,*
   344 U.S. 237 (1952).............................................................................19–20

*Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA,*
   92 F.4th 415 (2d Cir. 2024) ........................................................................5

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984).............................................................................23–24

*Royal Hall v. Agostino,*
   No. 19-cv-5929, 2020 WL 6746842 (E.D.N.Y. Nov. 17, 2020) ...............8

*Skelly Oil Co. v. Phillips Petroleum Co.,*
   339 U.S. 667 (1950)..................................................................................20

*Soule by Stanescu v. Connecticut Ass'n of Sch., Inc.,*
   57 F.4th 43 (2d Cir. 2022) ...................................................................15–18

*Soule v. Connecticut Ass'n of Sch., Inc.,*
   90 F.4th 34 (2d Cir. 2023) ..........................................................14, 16–18

*Steffel v. Thompson,*
   415 U.S. 452 (1974)..................................................................................13

*Town of Babylon, N.Y. v. James*,
   No. 22-cv-1681, 2023 WL 8734201 (E.D.N.Y. Dec. 19, 2023) .......................................9, 12

*Town of Black Brook v. State*,
   41 N.Y.2d 486 (1977) ...............................................................................................10

*United States v. Virginia*,
   518 U.S. 515 (1996) ..................................................................................................22

**Constitutions**

Article IX of the New York Constitution .....................................................................11–12

U.S. Const. amend. XIV
   § 1 ..............................................................................................................................21

**Federal Statutes**

28 U.S.C.
   § 2201 .........................................................................................................................7

42 U.S.C.
   § 1983 .................................................................................................................. passim

**State Statutes**

N.Y. Civ. Rts. Law
   § 40-d ..........................................................................................................................2

N.Y. Exec. Law
   § 63(1) ...................................................................................................................1, 18
   § 63(9) .........................................................................................................................1
   § 63(10) .......................................................................................................................1
   § 290(3) .......................................................................................................................1
   § 297 ............................................................................................................................1

N.Y. Mun. Home Rule Law 10
   § 1(i) ..........................................................................................................................11

**Rules**

Federal Rule of Civil Procedure 12(b)(1) ......................................................................6

Federal Rule of Civil Procedure 12(b)(6) ......................................................................6

Federal Rule of Civil Procedure 17(b) ............................................................................9

**Miscellaneous Authorities**

2022 National Survey on LGBTQ Youth Mental Health, The Trevor Project,
    https://www.thetrevorproject.org/survey-2022/ (last visited May 3, 2023) ..........................24

Alison R. Snyder et al., Health-Related Quality of Life Differs Between Adolescent
    Athletes and Adolescent Nonathletes, 19 J. Sport Rehab. 237, 238 (2010)
    https://pubmed.ncbi.nlm.nih.gov/20811075/; ..........................................................................24

*Females' Educational Attainment*, 38 Youth & Soc'y 443, 444 (2007)
    http://jvlone.com/sportsdocs/womenHighSchooltoCollege2007.pdf ....................................24

*Glossary of Terms: Transgender, GLADD Media Reference Guide: 11th Edition*,
    GLADD, https://glaad.org/reference/trans-terms/ (last visited Mar. 22, 2024)......................4

Wylie C. Hembree, Peggy T. Cohen-Kettenis, et al., *Endocrine Treatment of Gender-
    Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice
    Guideline* ................................................................................................................................4

## PRELIMINARY STATEMENT

Defendants, Letitia James, sued in her official capacity as Attorney General of the State of New York, the Office of the New York State Attorney General, and the State of New York (collectively, "Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss all claims and requests for relief asserted in the Complaint, dated March 5, 2024 (ECF No. 1).

The Attorney General is the chief legal officer in the State of New York. *See* N.Y. Exec. Law § 63(1). Among her duties include "prosecut[ing] and defend[ing] all actions and proceedings in which the state is interested, and hav[ing] charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interest of the state." *Id*. Ensuring the consistent statewide application of laws enacted by the legislature, including those prohibiting discrimination against individuals based on their protected status, is of paramount interest to the State and the public.[1] Accordingly, the Attorney General plays a central role in enforcing and defending these laws.[2] And these laws explicitly prohibit discrimination on the basis of sex,

---

[1] *See, e.g.*, N.Y. Exec. Law § 290(3) ("The legislature hereby finds and declares that the state has the responsibility to act to assure that every individual within this state is afforded an equal opportunity to enjoy a full and productive life and that the failure to provide such equal opportunity, whether because of discrimination, prejudice, intolerance or inadequate education, training, housing or health care not only threatens the rights and proper privileges of its inhabitants but menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants.").

[2] *See, e.g.*, N.Y. Exec. Law § 63(9) (empowering the Attorney General to "bring and prosecute or defend upon request of the commissioner of labor or the state division of human rights, any civil action or proceeding . . . necessary for effective enforcement of the laws of this state against discrimination"); N.Y. Exec. Law § 63(10) (providing authority to prosecute "persons charged with the commission of a criminal offense in violation of any of the laws of this state against discrimination" under circumstances where the Attorney General determines that "such prosecution cannot be effectively carried on by the district attorney"); N.Y. Exec. Law § 297

1

gender identity, and gender expression. The New York Human Rights Law has long prohibited discrimination based on sex. In 2019, the New York State Legislature enacted the Gender Expression Non-Discrimination Act, which added gender identity and gender expression as explicitly protected classes across a range of state civil rights laws, including those prohibiting discrimination in public accommodations, employment, housing, public schools, and other areas. The bill states that the Legislature was motivated by its finding that:

> many residents of this state have encountered prejudice on account of their gender identity or expression, and that this prejudice has severely limited or actually prevented access to employment, housing and other basic necessities of life, leading to deprivation and suffering. The legislature further recognizes that this prejudice has fostered a general climate of hostility and distrust, leading in some instances to physical violence against those perceived to live in a gender identity or expression which is different from that traditionally associated with the sex assigned to that person at birth.

Gender Expression Non-Discrimination Act, S. 1047 (2019) § 1.

In this case, Nassau County Executive Bruce Blakeman, acting in his official capacity, as well as Nassau County and two private individuals (collectively, "Plaintiffs") have sued the Attorney General, her office, and the State of New York, seeking to deprive them of authority to enforce the laws of this State, so that Nassau County may implement County Executive Order 2-2024. Among its other effects, Executive Order 2-2024 denies women's and girls' sports teams and leagues access to county facilities if they have transgender women and girls among their

---

(establishing procedures for complaints alleging human rights law violations, including roles for Attorney General, New York State Division of Human Rights ("DHR"), and private litigants); N.Y. Civ. Rts. Law § 40-d (requiring notice to be served upon the Attorney General prior to commencing private litigation alleging violation of state civil rights laws); *see also New York by Schneiderman v. Utica City Sch. Dist.*, 177 F. Supp. 3d 739, 748 (N.D.N.Y. 2016) (observing N.Y. Exec. Law § 63 confers on the Attorney General a "broad statutory grant of authority [that] includes the power to bring discrimination cases on behalf of the People of New York" and that the Attorney General's *parens patriae* standing is supported by the state's "interest in protecting its citizens from a broad range of discrimination") (internal quotations omitted).

participants, in plain violation of state antidiscrimination laws prohibiting discrimination on the basis of sex, gender identity, and gender expression.

The sweeping declaratory and injunctive relief Plaintiffs seek would essentially permit them to unilaterally abrogate these state laws through local executive action—excising those classes of individuals whom they believe should not share in the laws' protections—and prevent State officials from doing anything about it, contrary to their express statutory duty and authorization. This relief is extraordinary, and the lawsuit through which Plaintiffs seek it is baseless and riddled with procedural and substantive defects that render it nonjusticiable.

Plaintiffs' complaint is subject to dismissal on numerous grounds. Their claims against the Office of the Attorney General and the State are clearly barred by the Eleventh Amendment, along with any claim for retroactive relief against the Attorney General acting in her official capacity. Further, Plaintiffs lack capacity and/or standing to assert their claims. And finally, Plaintiffs fail to state any actionable claim under the Equal Protection Clause or any other law. Accordingly, the Complaint should be dismissed in its entirety.

## FACTUAL ALLEGATIONS

On February 22, 2024, Plaintiff Blakeman signed into law Executive Order 2024-2 (the "Order"), which creates three requirements that effectively prohibit transgender women and girls,[3] as well as girls' and women's teams that include or welcome them, from participating in women and girls' sporting events at Nassau County facilities. *See* ECF No. 10-2.  The Order, which applies to property of the Nassau County Department of Parks, Recreation, and Museums,

---

[3] The term "transgender" as used herein describes individuals whose gender identity differs from the sex they were assigned at birth and is inclusive of non-binary and other gender-nonconforming identities. Some New Yorkers have intersex traits that the Order does not address at all, because their sex characteristics (chromosomes, hormones, gonads, genitalia, etc.) do not conform with a binary construction of sex as either male or female.

3

and applies to any sporting event without limitation, requires a league, team, or other sports entity seeking use of these facilities to "expressly designate" itself as "male," "female," or "coed," "based on [participants'] biological sex at birth." *Id.* at 1. The Order prohibits the County from issuing any permit for a sporting event or competition to a sports entity designated for women or girls that allows "biological males" to participate but allows the agency to issue a permit where a sports entity for men or boys includes participation by "biological females."[4] *Id.* at 1–2. The Order defines gender as "the individual's biological sex at birth" and limits consideration of a birth certificate's identification of a participant's sex to birth certificates that were "filed at or near the time" of the participant's birth. *Id.* at 2. This restriction would seemingly require ignoring legal gender marker corrections on a participant's birth certificate made pursuant to state law.

On March 1, 2024, following its review of the Order's requirements, the Civil Rights Bureau of the New York State Office of the Attorney General ("OAG") sent a letter to Plaintiff Blakeman informing him the Order violated a number of state statutes prohibiting discrimination on the basis of sex, gender identity, and gender expression, including the state Human Rights Law ("HRL") and Civil Rights Law and demanded the Order's rescission within five business

---

[4] Defendants include here terminology used in the Order itself ("biological males" and "biological females") but note that these terms are neither accurate nor medically accepted and are viewed as derogatory to transgender women and girls and transgender men and boys. *See* Wylie C. Hembree, Peggy T. Cohen-Kettenis, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Guideline*, 102, 11, J. of Clinical Endocrinology & Metabolism, 3869, 3875 (2017); *Glossary of Terms: Transgender, GLADD Media Reference Guide: 11th Edition*, GLADD, https://glaad.org/reference/trans-terms/ (last visited Mar. 22, 2024).

4

days. *See* ECF No. 10-3 ("the OAG Letter").[5] The OAG Letter noted the Order's sweeping effects not only on local teams and leagues, but also on teams and leagues across the state that will attend competitions held at the approximately 100 County facilities covered by the Order. The OAG Letter further pointed out that the Order's effect, among other things, would be to require teams and leagues to conduct invasive questioning of their players, and to exclude women's and girls' teams and leagues that have transgender women and girl participants from access to public spaces, as well as requiring exclusion of individuals who fall outside of the gender binary such as intersex and non-binary people.

Rather than respond to the OAG Letter, on March 5, 2024, Plaintiffs initiated this litigation that pleads a single "cause of action" seeking a declaratory judgment that the OAG Letter, as well as any subsequent legal action by Defendants in relation to the Order, violate the Equal Protection Clause of the U.S. Constitution, and that the Order "is valid under the United States Constitution, Federal law, and state law." *See* ECF No. 1, ¶¶ 33–43. Several days later, Plaintiffs Blakeman and Nassau County moved for a temporary restraining order and/or preliminary injunction that would bar Defendants from "taking further action" relating to the Order, including "initiating any legal proceedings and/or actions" against Plaintiffs Blakeman or Nassau County. *See* ECF No. 10; ECF No. 10-5, at 28. That motion remains *sub judice*.

## LEGAL STANDARD

---

[5] The Court may take into account the full text of the letter, which is integral to Plaintiffs' Complaint, though they did not attach it as an exhibit or explicitly incorporate it by reference. *See Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA,* 92 F.4th 415, 436 (2d Cir. 2024) (explaining that when considering a motion to dismiss, "even if a document is not expressly incorporated by reference, the court may still consider it if the complaint relies heavily upon its terms and effect, rendering the document integral to the complaint") (internal citations and quotations omitted).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)). "The party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id.* (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir.1996)). This includes establishing the requirements of Article III standing. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("'The party invoking federal jurisdiction bears the burden of establishing the[ ] elements' of Article III standing.") (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (alteration omitted)).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Although a complaint's allegations are generally taken as true for purposes of a motion to dismiss, a plaintiff must provide "more than labels and conclusions . . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Application of this standard is "context specific," and requires the reviewing court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 681 (internal quotation marks omitted). The court is not "bound to accept as true a legal conclusion couched as factual allegation." *Id.* at 678. "[B]are assertions" that a government defendant "adopted a policy because of, not merely in spite of, its adverse effects on upon an identifiable group" must be rejected as conclusory. *Id.*

## ARGUMENT

I.  **PLAINTIFFS' COMPLAINT SUFFERS FROM SEVERAL INSURMOUNTABLE THRESHOLD DEFECTS REQUIRING DISMISSAL**

   A.  **Plaintiffs' Complaint fails to properly invoke subject matter jurisdiction under the Declaratory Judgment Act.**

As a preliminary matter, Plaintiffs plead a single cause of action as one for declaratory judgment, without asserting any substantive claim. *See* ECF No. 1, ¶¶ 33–43. But the Declaratory Judgment Act, 28 U.S.C. § 2201, does not by itself confer subject matter jurisdiction on federal courts and requires pleading an independent basis for jurisdiction. *See Correspondent Servs. Corp. v. First Equities Corp. of Fla.*, 442 F.3d 767, 769 (2d Cir. 2006). That deficiency alone renders Plaintiffs' claim subject to dismissal for lack of subject matter jurisdiction. To the extent the Court construes Plaintiffs' claim as asserted under the Equal Protection Clause, through 42 U.S.C. § 1983, this claim is nonetheless subject to dismissal on numerous threshold grounds.

   B.  **The Eleventh Amendment bars Plaintiffs' claims against the Office of the Attorney General and against the State, and any claim for retroactive relief against the Attorney General acting in her official capacity.**

All claims against the Office of the Attorney General and the State of New York must be dismissed on the additional jurisdictional ground that they are barred by the Eleventh Amendment to the United States Constitution.

The Eleventh Amendment prohibits suits against nonconsenting states in federal courts regardless of the relief sought. *McGinty v. State of New York*, 251 F.3d 84, 91 (2d Cir. 2001). The Eleventh Amendment also applies to suits against state agencies. *Davis v. Proud*, 2 F. Supp. 3d 460, 476–77 (2d Cir. 2014) ("Absent consent, the Eleventh Amendment to the United States Constitution bars suits in federal court by private parties against a State, one of its agencies or

7

departments or a state official acting in his or her official capacity.") (citing *California v. Deep Sea Research, Inc*., 523 U.S. 491, 502 (1998)); *Avni v. Pilgrim Psychiatric Ctr*., No. 05 Civ. 5346, 2006 WL 2505241, at *4 (E.D.N.Y. Aug. 28, 2006) ("Eleventh Amendment immunity also shields arms of the state, like a state agency."). "The Office of the Attorney General is unquestionably an arm of the State of New York for purposes of Eleventh Amendment immunity." *Giordani v. U.S. Dep't of Just*., No. 22-cv-642, 2022 WL 17488494, at *6 (E.D.N.Y. Dec. 7, 2022), appeal dismissed (Nov. 6, 2023) (internal quotation marks omitted).

Because Plaintiffs' only cause of action, liberally construed, attempts to assert a violation of the Fourteenth Amendment's Equal Protection Clause against Defendants, *see* Compl. ¶ 40, it necessarily is asserted under 42 U.S.C. § 1983. *See, e.g.*, *Pauk v. Bd. of Trustees of City Univ. of New York*, 654 F.2d 856, 865 (2d Cir. 1981) (referring to Section 1983 as "basis for securing redress for constitutional violations").

New York has not waived its Eleventh Amendment immunity for suits under § 1983, and "Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983." *Royal Hall v. Agostino*, No. 19-cv-5929, 2020 WL 6746842, at *1 (E.D.N.Y. Nov. 17, 2020) (citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38, 40 (2d Cir. 1977)). The State and the Office of the Attorney General are thus shielded from Plaintiffs' claim.

Further, to the extent that Plaintiffs' complaint could potentially be construed as seeking a declaration that the Attorney General's cease-and-desist letter *itself* violated the Equal Protection clause, any demand for such declaratory relief against the Attorney General in her official capacity is also barred under the Eleventh Amendment. *See Ex Parte Young*, 209 U.S. 123 (1908); *Jude v. New York State*, No. 07 Civ. 5890, 2009 WL 928134, at *4 (S.D.N.Y. Mar. 30, 2009) ("If a suit seeks retrospective remedies, such as damages or *declaratory relief*, from

government employees acting in their official capacities, the Eleventh Amendment bars that suit." (emphasis in original)).

Accordingly, all claims and requests for relief asserted against the Office of the Attorney General and the State of New York, and all claims for retroactive relief against the Office of the Attorney General acting in her official capacity are barred by the Eleventh Amendment.

### C.   Plaintiffs Blakeman and the County of Nassau lack capacity to assert constitutional claims against the State.

Plaintiff Blakeman, who sues in his official capacity as County Executive of the County of Nassau, and the County of Nassau lack authority to assert an Equal Protection Clause claim—the only remotely discernable cause of action in the Complaint—against Defendants, because counties, as subdivisions of the State, and their officers lack capacity to sue the state for constitutional violations under Section 1983.

Capacity to sue in federal court is "governed by Federal Rule of Civil Procedure 17(b)." *Town of Babylon, N.Y. v. James*, No. 22-cv-1681, 2023 WL 8734201, at *3 (E.D.N.Y. Dec. 19, 2023) (internal quotation marks omitted). Under Rule 17(b), "the capacity of a governmental entity to sue or be sued is a question of state law." *Id.* (internal quotation marks omitted). New York state law makes clear that Plaintiffs Blakeman and Nassau County lack capacity to sue the Defendants.

The New York Court of Appeals has held that New York follows "the traditional principle throughout the United States . . . that municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation." *City of New York v. State*, 86 N.Y.2d 286, 289 (1995). As the Court explained, "[c]onstitutionally as well as a matter of historical fact, municipal corporate bodies— counties, towns and school districts—are merely subdivisions of the State, created by the State

for the convenient carrying out of the State's governmental powers and responsibilities as its agents." *Id*. at 289–90; *see also Town of Black Brook v. State*, 41 N.Y.2d 486, 488 (1977) ("A local government is merely a political subdivision created by the sovereign State. As such, it exercises its powers subject to the direction and control of the State, and impairment of those powers raises no constitutional issue.").

This capacity rule "reflects a self-evident proposition about legislative intent: the manifest improbability that the legislature would breathe constitutional rights into a public entity and then equip it with authority to police state legislation on the basis of those rights." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d 377, 385 (2017) (internal quotation marks omitted). Municipal officials "suffer the same lack of capacity to sue the State." *City of New York*, 86 N.Y.2d at 291.

The improbable situation described by the New York Court of Appeals is precisely what Plaintiffs Blakeman and Nassau County are attempting to create. In its Complaint, Nassau County essentially seeks a finding that application of the New York Human Rights and Civil Rights laws to the Order would violate the rights of cisgender female athletes to equal protection. In other words, it attempts to impose the County's interpretation of the New York State Human Rights Law and Civil Rights Law on the State. As a subdivision and creation of the state, the County lacks such authority.[6]

---

[6] Plaintiffs Blakeman and Nassau County also do not have authority to sue as *parens patriae*. While states may sue as *parens patriae* to vindicate interests of their citizens, "political subdivisions such as cities and counties, whose power is derivative and not sovereign, cannot sue as *parens patriae*." *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122, 131 (9th Cir. 1973); *see also City of New York v. Heckler*, 578 F. Supp. 1109, 1123 (E.D.N.Y.), *aff'd*, 742 F.2d 729 (2d Cir. 1984) ("A city generally does not have *parens patriae* standing.").

Four exceptions are recognized to this general capacity rule: (1) where the municipality has statutory authority to sue; (2) where a municipality has a proprietary interest in a specific fund of moneys; (3) where the State action interferes with the municipality's home rule powers under Article IX of the New York Constitution; and (4) where the State action would oblige the municipality to violate a constitutional proscription. *In re World Trade Ctr.,* 30 N.Y.3d at 386. The Court of Appeals has "stress[ed] that the exceptions [it has] recognized" to the capacity rule "are narrow." *Id. a*t 387.

The Complaint pleads none of these recognized exceptions. First, no statutory authority to sue can be identified. The Complaint seemingly identifies only one cause of action under the Fourteenth Amendment's Equal Protection Clause. Counties and county officials lack capacity to assert a claim under the Fourteenth Amendment because they are not "persons" within the meaning therein. *Cnty. of Chautauqua v. Shah*, 126 A.D.3d 1317, 1321 (4th Dep't 2015), *aff'd sub nom. Cnty. of Chemung v. Shah*, 28 N.Y.3d 244 (2016) ("'Municipalities cannot challenge state action on federal constitutional grounds because they are not 'persons' within the meaning of the Due Process Clause'" (quoting *City of East St. Luis v. Circuit Court for Twentieth Jud. Circ., St. Clair Cty, Ill.*, 986 F.2d 1142, 1144 (7th Circ. 1993)). And New York law is clear that the Fourteenth Amendment is not a vehicle for municipalities to sue their state creators. *See, e.g*., *City of New York*, 86 N.Y.2d at 289.

The second exception does not apply because there is no allegation that this matter involves Nassau County's proprietary interest in any monetary fund. *See, e.g*., Compl. ¶¶ 34–43. The third exception does not apply: rescinding the Order would not interfere with any home rule authority of Nassau County because the Order is inconsistent with provisions of the New York State Human Rights Law and Civil Rights Law. *See* N.Y. Mun. Home Rule Law 10 § 1(i)

("[E]very local government shall have power to adopt and amend local laws not inconsistent with the provisions of the constitution or not inconsistent with any general law relating to its property, affairs or government"); N.Y. Const., art. IX, § 2 (same).

Finally, the fourth exception does not apply because the Complaint does not plausibly allege that rescinding the Order would compel Nassau County to violate a constitutional proscription. If the Order were invalidated or enjoined, the Nassau County Department of Parks, Recreation, and Museums would merely revert to making permitting decisions as before, without being forced to participate in a County-mandated scheme of policing sports participants' sex and discriminating based on gender identity. In any event, Plaintiffs fail to demonstrate that the constitutional or statutory proscription is an express, blanket prohibition. *See Merola v. Cuomo*, 427 F. Supp. 3d 286, 292 (N.D.N.Y. 2019) (rejecting application of fourth capacity exception, explaining, "New York courts have interpreted constitutional or statutory proscriptions to be something expressly forbidden") (citing *Bellanca v. N.Y. State Liquor Auth.*, 54 N.Y.2d 228, 230–31 (1981)). Plaintiffs' motion and accompanying papers identify no express constitutional or statutory proscription that would be invoked if Defendants retain their discretion to enforce state antidiscrimination laws and the Order were then subsequently invalidated or enjoined. Accordingly, Plaintiffs Blakeman and Nassau County cannot demonstrate a likelihood of success on their claim, as they lack capacity to bring it.[7]

_____

[7] Some federal courts have held that they lack subject matter jurisdiction over Fourteenth Amendment claims by municipalities against their creators because municipalities lack standing to assert such claims. *See, e.g.*, *Town of Babylon v. James*, No. 22-cv-1681, 2023 WL 8734201, at *10 (E.D.N.Y. Dec. 19, 2023) (holding towns "lack standing to bring a Fourteenth Amendment action against New York and its Attorney General under binding Second Circuit precedent, and thus this Court lacks jurisdiction to hear their claims"); *see also Aguayo v. Richardson*, 473 F.2d 1090, 1101 (2d Cir. 1973) ("The City lacks standing to assert constitutional claims against the State[.]"). However, the Court need not decide whether the bar

**D.      Plaintiffs Blakeman and Nassau County fail to demonstrate injury sufficient to support their standing to bring a pre-enforcement challenge to application of state civil rights laws.**

Plaintiffs Blakeman and Nassau County also lack standing to bring a pre-enforcement challenge to the state civil rights laws at issue here because they do not demonstrate a sufficiently imminent injury arising from their enforcement. "For an alleged injury to support constitutional standing, it must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 383 (2d Cir. 2015) (internal quotation marks omitted). While in some circumstances a plaintiff may allege an injury based on the "threat of prosecution," such a challenge must be accompanied by "plausible allegations that a plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute," and they are threatened by prosecution. *Id*.

Here, Plaintiff Blakeman's declaration is devoid of support that either he or Nassau County have a "constitutional interest" in the implementation of the Order. At best, their justification for the Order is that some subset of residents within the County, as they describe it, will "be discriminated against and their constitutional rights . . . will be violated." ECF No. 10-4, ¶ 3. Unlike in circumstances where a plaintiff alleges imminent injury to his or her own constitutional interest, such as in First Amendment cases, *see, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), the purported constitutional injuries Plaintiffs point to here are entirely possessed by third parties. *See* ECF No. 10-4, ¶¶ 3–4. Moreover, the Second Circuit has held that the rights secured under Section 1983 are "personal to those purportedly injured." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (internal quotation marks omitted); *see also Knife*

---

to suit by Plaintiffs Blakeman and Nassau County is a capacity question or a standing question that invokes subject matter jurisdiction, because either provides a basis for dismissal here.

*Rights*, 802 F.3d at 387. Thus, Plaintiffs fail to demonstrate sufficient injury to support their standing and their claim should be dismissed.

**E.      The individual plaintiffs lack standing.**

Plaintiffs Marc and Jeanine Mullen, who sue solely on behalf of their minor daughter, K.E.M., lack standing to assert their claim because they fail to allege a concrete and imminent injury-in-fact.

To establish standing, a plaintiff must identify "an invasion of a legally protected interest which is . . . concrete and particularized . . . and . . . actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted). To confer standing, an alleged injury must be traceable to the defendant's actions and capable of being redressed through a favorable judicial decision. *Id*. "An injury-in-fact must be distinct and palpable, as opposed to abstract, and the harm must be actual or imminent, not conjectural or hypothetical." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006) (internal quotation marks omitted). The individual Plaintiffs bear the burden of demonstrating that they have standing because they seek to invoke federal jurisdiction. *Lujan*, 504 U.S. at 561. And because "[s]tanding is not dispensed in gross… plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Soule v. Connecticut Ass'n of Sch., Inc*., 90 F.4th 34, 45 (2d Cir. 2023) (hereinafter "*Soule II*") (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)).

Although an alleged future injury may confer standing, "conjecture about speculative or possible harm is inadequate." *Parents Protecting Our Child., UA v. Eau Claire Area Sch. Dist.*, No. 23-1534, 2024 WL 981436, at *3 (7th Cir. Mar. 7, 2024) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Instead, "[t]he claimed future injury must be 'certainly

impending to constitute injury in fact,' and 'allegations of possible future injury are not sufficient.'" *Soule by Stanescu v. Connecticut Ass'n of Sch., Inc*., 57 F.4th 43, 50 (2d Cir. 2022) (hereinafter "*Soule I*") (quoting *Clapper*, 568 U.S. at 409).

The individual plaintiffs do not identify a concrete injury to themselves or to K.E.M., their sixteen-year-old daughter. Although the Mullens do not assert claims on behalf of themselves, they nevertheless allege that they will be "forced into making the impossible determination whether to expose their 16-year-old daughter to the risk of injury by a transgender girl or simply to not play volleyball." Compl. ¶ 30. They also vaguely allege that K.E.M. will be "penalized" if the Order is rescinded. *Id.* These allegations amount to only conjecture and speculative harm.

The Complaint is devoid of any factual allegations that could demonstrate a risk of actual and imminent injury to K.E.M. The totality of the allegations regarding K.E.M.'s participation in sports is that she is a high school volleyball player. Compl. ¶¶ 7, 8. Plaintiffs do not allege that K.E.M. is part of any team, much less any team that would seek a permit to use a county sports facility. Further, Plaintiffs do not identify any team that may have transgender athletes as members against which K.E.M. could potentially play at a county facility. To the extent that the Complaint can be read to suggest that K.E.M. risks being injured by an unspecified transgender athlete in a hypothetical future game, or that she will miss out on possible future opportunities because of participation by transgender athletes in volleyball, *see* Compl. ¶¶ 25–29, 31–32, those allegations amount at most to a "possible future injury" and fall far short of a "certainly impending" injury in fact. *Soule I*, 57 F.4th at 50; *see also John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 631 (4th Cir. 2023) (finding parents lacked standing to

challenge transgender-inclusive school policies because "[t]he parents' claims likewise depend on a speculative fear, the occurrence of which requires guesswork as to actions of others").

In *Soule I*, on which Plaintiffs rely, *see* Pls.' Mem. (ECF No. 10-5) at 9, 10, 18, female athletes brought claims under Title IX of the Education Amendments of 1972 seeking to enjoin a state athletic association rule that permitted transgender athletes to play on sports teams consistent with their gender identity. Plaintiffs alleged that being forced to compete against transgender girls had resulted in them placing lower in various competitions, and further, that the participation of transgender female athletes would result in fewer future opportunities for cisgender female athletes, including for victory in sports, public recognition, scholarships, and employment. *See Soule I*, 57 F.4th at 47. But the Second Circuit rejected the plaintiffs' broad challenge to the rule, holding that the potential future injuries alleged by the cisgender female athletes did not amount to a sufficiently concrete or "certainly impending" injury. *Id.* at 51–52. On subsequent *en banc* review, the Second Circuit upheld the finding that the plaintiffs lacked standing to seek injunctive relief based on generalized allegations of harm from the rule's operation:

> Plaintiffs do not have standing to seek remedies for generalized grievances about the CIAC Policy . . . . Plaintiffs may disagree with the way in which the CIAC's policy recognizes transgender girls and their athletic achievements, but policy disagreement without particularized harm is not a basis for Article III standing. Thus, Plaintiffs only have standing to seek the injunctive relief requested to the extent they seek to alter records related to the particularized injury they allege.

*Soule II*, 90 F.4th at 50.[8]

---

[8] Although the *en banc* court reversed dismissal of the plaintiffs' Title IX claims *in toto* for lack of standing and remanded for consideration of whether they had stated a claim under the statute, that holding was expressly limited to their ability to seek retroactive injunctive relief— specifically, money damages and post-hoc correction of official race records in connection with specific races that had *already occurred*, in which the plaintiffs alleged they had finished behind

16

Similarly, in *Parents Protecting Our Children*, the Seventh Circuit affirmed the district court's finding of lack of standing by parents asserting a challenge to a school district's guidance document that informed schools on how to support transgender, nonbinary, or gender non-conforming students. 2024 WL 981436, at *1. The Seventh Circuit held that parents' concerns about the future application of the guidance "[did] not suffice to show that any parent has experienced actual injury or faces any imminent harm attributable to the [guidance]" and were therefore insufficient to establish Article III standing. *Id.* at **3–4.

The Individual Plaintiffs' non-concrete, wholly speculative allegations are insufficient to demonstrate imminent harm if the Order is enjoined. As in *Soule I*, the Individual Plaintiffs seek to enjoin the operation of a statewide rule—here, the application of the Human Rights Law to the Order—based on nothing more than a generalized fear that, should the Order eventually be enjoined, they might someday be required to compete against a hypothetical transgender female athlete at a county facility *and* that as a result they will either suffer an injury they would not have otherwise suffered or be deprived of some unspecified recognition or future opportunity they would have otherwise enjoyed. These allegations rely on "a highly attenuated chain of possibilities," and therefore fall short of identifying the type of concrete, imminent, and certainly impending harm necessary to invoke Article III standing. *See Clapper*, 568 U.S. at 410. And in the absence of any specific allegations of actual, impending harm, this amounts to the sort of "generalized grievance" based on a "policy disagreement" that the Second Circuit has rejected as

---

particular transgender athletes who had intervened as defendants in the suit. *Soule II*, 90 F.4th at 54. The panel's holding in *Soule I* that the plaintiffs lack standing to seek forward-looking injunctive relief based on speculative future injury remains good law.

a basis for standing in an analogous context. *See Soule I*, 57 F.4th at 50; *Soule II*, 90 F.4th at 50.[9]

Accordingly, the Individual Defendants lack standing to assert their claims.

**F.      The request for a preemptive injunction against the Attorney General prohibiting enforcement of New York law is non-justiciable.**

In anticipation of potential future legal action by the Attorney General, Plaintiffs preemptively seek declaratory and injunctive relief preventing the Attorney General from taking any steps to challenge the Order on any basis. But New York Courts have long recognized that the Attorney General is charged with discretion with respect to the exercise of her statutory duties to enforce New York law. The Court should follow this precedent and dismiss as non-justiciable Plaintiffs' improper demand to so limit her official enforcement authority.

The Attorney General's duties include the duty to: "Prosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interest of the state." N.Y. Exec. Law § 63(1). The Attorney General is afforded broad discretion as to whether and when to do so. For example, in *State v. Wolowitz*, after the Attorney General investigated allegedly unlawful practices by a Suffolk-county landlord, the landlord sought to enjoin the Attorney General from "any interference with [the landlord] in the conduct of his business." 96 A.D.2d 47, 52 (2d Dep't 1983). The Appellate Division, in denying the requested injunction, explained: "'It is the settled policy of the courts not to review [by way of an action for an injunction] the exercise of

---

[9] As discussed above, any claim for retroactive relief against the Attorney General in her official capacity would further be barred under the Eleventh Amendment. *See Jude v. New York State*, No. 07 Civ. 5890, 2009 WL 928134, at *4 (S.D.N.Y. Mar. 30, 2009) ("If a suit seeks retrospective remedies, such as damages or *declaratory relief*, from government employees acting in their official capacities, the Eleventh Amendment bars that suit." (internal quotation marks omitted) (emphasis in original)).

discretion by public officials in the enforcement of State statutes, in the absence of a clear violation of some constitutional mandate.'" *Id.* at 56 (quoting *Gaynor v. Rockefeller*, 15 N.Y.2d 120, 131 (1965)). The court further explained, "Respondent's remedy, in the face of such a proceeding, would be, and is, simply to defend on the merits and, if necessary, by way of appeal." *Id*. at 58.

In an action seeking to compel the Attorney General to take action, the Supreme Court, New York County, explained in detail the reasons for judicial hesitancy to interfere with the Attorney General's exercise of her authority:

> The power of determining whether the action shall be commenced must exist somewhere. . . . Our legislature has seen fit to invest the attorney general with this discretion. His office is a public trust. It is a legal presumption that he will do his duty; that he will act with strict impartiality. In this confidence he has been endowed with a large discretion, not only in cases like this, but in other matters of public concern. The exercise of such discretion is, in its nature, a judicial act, from which there is no appeal, and over which courts have no control.

*Lewis v. Lefkowitz*, 32 Misc. 2d 434, 436 (Sup. Ct. N.Y. 1961). *Cf. also Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 247 (1952) (disapproving of "anticipatory declarations" as to state statutes and deeming intolerable "[a]nticipatory judgment by a federal court to frustrate action by a state agency").

This deferential approach, grounded in bedrock separation-of-powers concerns, should be the guiding principle in this matter. Here, if the Attorney General should choose to commence an action to challenge the Order, she would be free to determine, within her discretion, which legal claims to assert and what supporting factual allegations to plead. And the County Plaintiffs here, as likely defendants in any such action, would have the opportunity "simply to defend on the merits" any action or proceeding that the Attorney General might bring—including by raising Equal Protection arguments. But the sweeping declaratory and injunctive relief Plaintiffs seek—

19

that application of the Human Rights Law to the Order would violate the right to equal protection, and further, that the Order "is valid under the United States Constitution, Federal law, and state law"—would tie the State's hands from taking *any enforcement action whatsoever* against the Order. Validating Plaintiffs' bald effort to preemptively wrest this discretion from the State would fly in the face of these well-settled norms.

Moreover, to the extent the Court construes Plaintiffs' claims as asserted under the Equal Protection Clause, through 42 U.S.C. § 1983, they lack any merit in this forum (as discussed *infra*, Points I and II), and Plaintiffs will remain free to assert constitutional arguments in *defense* if they face a future action brought under New York State law.[10] Section 1983 is not a proper vehicle through which to raise such a defense. And further, it is well-established that federal courts lack subject matter jurisdiction in Declaratory Judgment actions arising under state law "merely because an anticipated defense [is] derived from federal law." *See Skelly Oil Co. v. Phillips Petroleum Co*., 339 U.S. 667, 673–74 (1950). As the Supreme Court has explained, "[t]o sanction suits for declaratory relief as within the jurisdiction of the District Courts merely because, as in this case, artful pleading anticipates a defense based on federal law would contravene the whole trend of jurisdictional legislation by Congress, disregard the effective functioning of the federal judicial system and distort the limited procedural purpose of the Declaratory Judgment Act." *Id.*; *see also Pub. Serv. Comm'n of Utah v. Wycoff Co*., 344 U.S. 237, 247 (1952) (rejecting "[a]nticipatory judgment by a federal court to frustrate action by a state agency"). Plaintiffs attempt to circumvent this rule by "artful[ly] pleading" a nonviable

---

[10] Defendants note that the OAG Letter raised only state law bases for any potential enforcement action. *See* ECF No. 10-3.

Equal Protection claim to bring this action into federal court. The Court should reject this attempt.

Furthermore, the injunctive relief Plaintiffs seek would create an incongruous situation in which private parties would be permitted to assert challenges to the Order while the Attorney General is precluded from doing so. One such action by a private party has already been filed. *See Long Island Roller Rebels v. Blakeman*, Index No. 604254/2024 (Sup. Ct. Nassau County), NYSCEF Doc. No. 29 (Order to Show Cause, Mar. 13, 2024). While litigation by private parties remains an important mechanism for the enforcement of constitutional and statutory rights, the clear statutory authority granted to the Attorney General demonstrates that it is the policy of New York State to allow public officials charged with prosecutorial duties to exercise that authority as they see fit.

For these reasons, the Plaintiffs' claims should be dismissed.

## II.     PLAINTIFFS FAIL TO STATE A CLAIM ON THE MERITS

Even assuming Plaintiffs could overcome the threshold defects discussed in Part I, which they cannot, Plaintiffs fail to state any viable Equal Protection claim.

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a claim for an Equal Protection violation based on gender, a plaintiff must allege that a government actor intentionally discriminated against them on that basis. *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999). A plaintiff can demonstrate intentional discrimination in one of three ways: First, "a law or policy is discriminatory on its face if it expressly classifies persons on the basis of . . . gender.

21

*Id. (citing Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 213, 227–29 (1995)). Second, "a law which is facially neutral violates equal protection if it is applied in a discriminatory fashion. *Id. (citing Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)). And finally, "a facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect." *Id. (citing Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977)).

Plaintiffs fail to allege any facts supporting a conclusion that enforcement of a neutral and generally applicable state anti-discrimination statute would constitute intentional discrimination by the OAG. The HRL prohibits discrimination based on protected characteristics, including sex, gender identity, and gender expression. Plaintiffs do not appear to contest that the statute prohibits discrimination based on those characteristics. Rather, construed liberally, their argument appears to be that enforcing the HRL against the county would have a discriminatory effect on cisgender women and girls who play sports in Nassau County, and thereby violate the Equal Protection Clause. This is insufficient to state an Equal Protection violation.[11]

---

[11] To the contrary, it is the Order itself which violates the Equal Protection Clause. Because the Order discriminates on the basis of sex and transgender status, it is a sex-based classification. *See Bostock v. Clayton County*, 590 U.S. 644, 660 (2020) ("[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020), as amended (Aug. 28, 2020) ("We agree with the Seventh and now Eleventh Circuits that when a School District decides which bathroom a student may use based upon the sex listed on the student's birth certificate, the policy necessarily rests on a sex classification . . . such a policy cannot be stated without referencing sex. . . . On that ground alone, heightened scrutiny should apply.") (internal quotation marks and citations omitted); *see also Hecox v. Little*, 79 F.4th 1009, 1027 (9th Cir. 2023).

The Order fails heightened scrutiny because it imposes a facial sex-based classification, utterly lacks an "exceedingly persuasive justification," and is not substantially related to

First, Plaintiffs do not allege that enforcing the HRL against the county in connection with the Order draws any sex classifications. It does not. The HRL applies equally to any violator, regardless of their sex or their membership in any other protected class. *Cf. Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984) (state statute prohibiting sex discrimination in public accommodations upheld against constitutional challenges by private men's group).

Second, Plaintiffs do not plead that the OAG seeks to enforce the HRL in a selective or discriminatory fashion. *Cf. id.* It does not. Any enforcement action taken would result from the County's discriminatory conduct in promulgating an Order that facially discriminates based on sex and gender identity, which the HRL expressly prohibits.

Plaintiffs appear to attempt the third possibility: Their claim, construed broadly, is that the application of the HRL would have discriminatory effects. But the Equal Protection clause does not apply to conduct that is facially neutral, even if discriminatory in effect, absent allegations of animus. *See Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979); *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999). Plaintiffs do not allege that

---

important government interests. *United States v. Virginia*, 518 U.S. 515, 555 (1996). The Order classifies based on sex by placing restrictions on girls' and women's teams, who are mandated to exclude transgender athletes and will thus be subject to greater scrutiny, in contrast to boys', men's, or co-ed teams. It further categorically bans transgender girls and women from playing on girls' and women's teams.

Plaintiffs claim the Order serves to promote women's equality in sports and prevent injury, and to be sure, these are important government interests. However, categorically banning transgender women and girls from playing sports and excluding girls' and women's teams who welcome transgender athletes are not substantially related to those interests. There is no means-end fit between Plaintiffs' purported goals and the overbroad, patently discriminatory approach they have taken here. The Order cannot survive heightened scrutiny and therefore violates the Equal Protection Clause.

the OAG's enforcement efforts are motivated by discriminatory animus against any group, including cisgender women and girls in sports.

Simply put, Plaintiffs' complaint is bare of any legal or factual support for their claim that the OAG's anticipated efforts to enforce a neutral state anti-discrimination statute will constitute intentional discrimination against cisgender women and girls who play sports in Nassau County.[12] Such conclusory allegations fail as a matter of law. *Iqbal*, 556 U.S. at 679 (Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.")

**CONCLUSION**

---

[12] Moreover, any future action taken by the OAG to prevent operation of the Order, under the HRL or on any other grounds, would not violate the Equal Protection Clause because it would satisfy any level of scrutiny. The State of New York vests the OAG with authority to vindicate the civil rights of New Yorkers. Those rights include the right to be free from discrimination in the enjoyment of public accommodations on the basis of protected characteristics, and thus, from suffering the "stigmatizing injury, and the denial of equal opportunities that accompanies" such exclusion. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984). Preventing such discrimination has long been recognized as a "compelling state interests of the highest order." *Id.* at 624.

Transgender individuals face pervasive discrimination in their daily lives, including exclusion from many aspects of public life. This pernicious discrimination leads to numerous harmful outcomes for transgender individuals, and particularly for transgender youth, who experience disproportionate rates of depression and suicide, among other serious harms. *See* 2022 National Survey on LGBTQ Youth Mental Health, The Trevor Project, https://www.thetrevorproject.org/survey-2022/ (last visited May 3, 2023). And exclusion from sports activities in particular deprives transgender individuals of the many proven benefits associated with athletic participation. *See* Alison R. Snyder et al., Health-Related Quality of Life Differs Between Adolescent Athletes and Adolescent Nonathletes, 19 J. Sport Rehab. 237, 238 (2010) https://pubmed.ncbi.nlm.nih.gov/20811075/; Kelly P. Troutman & Mikaela J. Dufur, *From High School Jocks to College Grads: Assessing the Long-Term Effects of High School Sport Participation on Females' Educational Attainment*, 38 Youth & Soc'y 443, 444 (2007) http://jvlone.com/sportsdocs/womenHighSchooltoCollege2007.pdf. The State would therefore be amply justified in taking steps to prevent those serious harms no matter the level of scrutiny applied.

For the reasons set forth above, Defendants respectfully request that the Court dismiss all claims and requests for relief asserted in the Complaint, in their entirety and with prejudice, and grant such other and further relief that the Court deems just and equitable.

Dated: New York, New York
      March 28, 2024

LETITIA JAMES
Attorney General of the State of New York

By:  /s/ *Zoe Ridolfi-Starr*

Travis England, *Deputy Bureau Chief*
Zoe Ridolfi-Starr, *Assistant Attorney General*
Civil Rights Bureau
Office of the New York State Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
(212) 416-8306 | Zoe.Ridolfi-Starr@ag.ny.gov

Helena Lynch, *Assistant Attorney General*
Office of the New York State Attorney General
200 Old Country Road, Suite 240
Mineola, New York 11501