# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Bruce A. Blakeman, in his official capacity as County Executive of the County of Nassau; County of Nassau; Marc Mullen, as parent and natural guardian of K.E.M., an infant under the age of eighteen years; and Jeanine Mullen, as parent and natural guardian of K.E.M., an infant under the age of eighteen years,<br><br>        Plaintiffs,<br><br>      -v-<br><br>Letitia James, as Attorney General of the State of New York; State of New York Office of the Attorney General; and State of New York,<br><br>        Defendants. | 2:24-cv-1655<br>(NJC) (LGD) |

## OPINION AND ORDER

NUSRAT J. CHOUDHURY, District Judge:

Plaintiffs Bruce A. Blakeman ("Blakeman") and Nassau County (together "County Plaintiffs"), and Marc and Jeanine Mullen (together "Individual Plaintiffs") filed a Complaint for declaratory and injunctive relief against the State of New York ("New York"), the State of New York Office of the Attorney General ("OAG"),[1] and Letitia James ("James"), in her capacity as the Attorney General of the State of New York ("NY Attorney General," collectively, "Defendants"). (Compl., ECF No. 1.) The Complaint brings a single claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. (Compl. ¶¶ 33–35.) Plaintiffs' claim concerns a cease-and-desist letter

---

[1] New York law refers to the OAG as the "New York Department of Law." *See* N.Y. Const. art. V, § 4 ("The head of the . . . department of law[ shall be] the attorney-general."); *see also* N.Y. Exec. Law § 60.

from the OAG to Nassau County asserting that Nassau County Executive Order 2-2024 ("Executive Order") violates the New York Human Rights Law's prohibition against discrimination on the bases of sex and gender identity and expression. (OAG Ltr., ECF No. 10-3 (citing N.Y. Exec. Law §§ 296(2), (6)).) The letter calls for the County Plaintiffs to rescind the Executive Order and produce the documents that supported its issuance, or else face further legal action by the OAG. (*Id.* at 9.) The Complaint alleges that the OAG's action to enforce the New York Human Rights Law as applied to the Executive Order violates the rights of women and girl athletes in Nassau County to equal protection under the law. (Compl. ¶¶ 35, 38–41.)

On March 7, 2024, the County Plaintiffs filed an Order to Show Cause seeking an order "temporarily restrain[ing] and enjoin[ing]" Defendants "from initiating any legal proceedings and/or actions" against Blakeman "related to [the Executive Order]." (ECF No. 10 at 2.) The County Plaintiffs' supporting brief asks for an order "staying AG James' demand for document production, preventing her from taking further legal action and declaring Executive Order Number 2-2024 valid under the U.S. Constitution, Federal Law, and State Law." (Cnty. Pls.' Br. at 5, ECF No. 10-5.) On March 11, 2024, following the reassignment of this case to this Court's docket, the County Plaintiffs filed a proposed Temporary Restraining Order ("TRO") reiterating these requests for a temporary restraining order and preliminary injunction. (*See* Proposed TRO, ECF No. 17 at 3–4.) The Court construes the Order to Show Cause as the County Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction ("TRO/PI Motion").[2]

---

[2] The Court overlooks any procedural deficiency in the County Plaintiffs' submission and construes it as a TRO/PI Motion because Plaintiffs "submitt[ed] a memorandum of law and supporting documents that allow the Court to consider the proposed motion" (ECF Nos. 10-5, 14, 17) and because "the parties are fairly and adequately apprised of the nature and basis of the application." *Fiedler v. Incandela*, 222 F. Supp. 3d 141, 155 (E.D.N.Y. 2016) (quotation marks omitted).

The Court has reviewed the parties' submissions on the fully briefed TRO/PI Motion: (1) the Complaint (ECF No. 1); (2) the County Plaintiffs' Order to Show Cause and Proposed Temporary Restraining Order (ECF Nos. 10, 17); (3) the County Plaintiffs' Memorandum of Law (ECF No. 10-5); (4) the Affidavit of Bruce A. Blakeman (ECF No. 10-4); (5) the Declaration of County Plaintiffs' counsel, Victoria LaGreca, and attached exhibits (ECF Nos. 10-1–10-3); (6) the Defendants' opposition brief (ECF No. 18); and (7) the County Plaintiffs' reply brief (ECF No. 21). The Individual Plaintiffs did not join in the County Plaintiffs' TRO/PI Motion. (*See* ECF Nos. 10, 17.) Although the Court provided the Individual Plaintiffs an opportunity to present their position on the TRO/PI Motion, they elected not to do so.[3]

At a conference with the Court on March 12, 2024, the County Plaintiffs requested an expedited resolution of the TRO Motion. (Conf., Mar. 12, 2024.) No party requested discovery or an evidentiary hearing on the PI Motion, whether during the conference or in their submissions to the Court. (*Id.*; *see also* ECF Nos. 1, 10, 10-1–10-5, 17, 18, 21.)

The County Plaintiffs' TRO/PI Motion falls far short of meeting the high bar for securing the extraordinary relief of a temporary restraining order from this Court. Plaintiffs' claims are nonjusticiable for multiple reasons: (1) Eleventh Amendment sovereign immunity bars the declaratory and injunctive relief claim against Defendants New York and the OAG, as well as any claim for retrospective declaratory relief against Defendant James in her official capacity; (2) the County Plaintiffs lack capacity to bring the equal protection claim under Rule 17(b), Fed. R. Civ. P., and New York's capacity-to-sue rule; and (3) the record does not establish Plaintiffs'

---

[3] As discussed below, the Court set a March 22, 2024 deadline for the Defendants and the Individual Plaintiffs to respond to the County Plaintiffs' TRO/PI Motion. Although the Defendants provided a timely response, the Individual Plaintiffs did not submit anything. (Elec. Order, Mar. 28, 2024.)

standing to bring the equal protection claim pled in the Complaint. Moreover, the County

Plaintiffs' submission fails to demonstrate irreparable harm—a critical prerequisite for the

issuance of a temporary restraining order. For the reasons addressed below, the Court denies the

County Plaintiffs' TRO Motion and reserves decision on the PI Motion following the resolution

of Defendants' Motion to Dismiss (ECF No. 20).

## BACKGROUND

The NY Attorney General is New York's chief legal officer. *See* N.Y. Const. art. V, § 4;

N.Y. Exec. Law § 63(1). Under New York law, the Attorney General:

> [p]rosecut[es] and defend[s] all actions and proceedings in which the state is
> interested, and ha[s] charge and control of all the legal business of the
> departments and bureaus of the state, or of any office thereof which requires the
> services of attorney or counsel, in order to protect the interest of the state . . . .

N.Y. Exec. Law § 63(1). The New York Legislature has granted the Attorney General a central

role in ensuring the consistent application and enforcement of laws enacted by the legislature,

including New York's anti-discrimination laws. The New York Executive Law empowers the

Attorney General to "[b]ring and prosecute or defend upon request of the commissioner of labor

or the state division of human rights, any civil action or proceeding . . . necessary for effective

enforcement of the laws of this state against discrimination . . . ." *Id*. § 63(9). It also grants the

Attorney General authority to prosecute people for criminal violations of state anti-

discrimination laws in certain circumstances, *id*. § 63(10), to file a complaint of Human Rights

Law violations, *id*. § 297(1), and to play a role in the investigation and handling of Human

Rights Law complaints, *id*. § 297. The New York Civil Rights Law requires notice to be served

upon the Attorney General prior to the commencement of any private litigation alleging the

violation of state civil rights laws. N.Y. Civ. Rts. Law § 40-d.

On February 22, 2024, Blakeman signed into law Executive Order 2024-2, titled "An Executive Order for Fairness for Women and Girls in Sports." (E.O., ECF No. 10-2.) The Executive Order relates to the process for securing a permit to use Nassau County Parks property[4] for "organizing a sporting event or competition" and does three main things. (E.O. at 1.) First, it requires that any permit applicant seeking to use Nassau County Parks property for a sporting event or competition "must expressly designate" whether the activity relates to (1) "[m]ales, men, or boys," (2) "[f]emales, women, or girls," or (3) "[c]oed or mixed, including both males and females" "based on [participants'] biological sex at birth." (*Id.*) Second, the Executive Order prohibits the Nassau County Department of Parks, Recreation and Museums (the "Parks Department") from issuing a permit for any sporting event or competition designated for "females, women, or girls" that allows "biological males" to participate, but allows the Parks Department to issue permits for sporting events or competitions designated for "males, men, or boys" that include participation by "biological females." (*Id.* at 1–2.)[5] Third, the Executive Order

---

[4] The plain text of the Executive Order refers to permits to use and occupy "Nassau County Parks property" (*see* E.O. at 1), but Defendants characterize the Executive Order as applying to all property under the purview of the Nassau County Department of Parks, Recreation and Museums. (Defs.' Br. at 3.) The full name of the department overseeing Nassau County Parks property is the "Nassau County Department of Parks, Recreation, and Museums." *See* Nassau County, Departments, Parks, Recreation and Museums, About Parks, https://www.nassaucountyny.gov/1768/About-Parks (last visited Apr. 2, 2024). According to Nassau County's website, there are "more than 70 parks, preserves, museums, historic properties, and athletic facilities comprising 6,000 acres throughout the county." *Id.* The Court need not resolve whether the Executive Order applies to all property under the purview of the Nassau County Department of Parks, Recreation and Museums or only a subset consisting of "Nassau County Parks property," as that term is used in the Executive Order, in order to resolve the County Plaintiffs' TRO Motion.

[5] This Opinion and Order uses the terms "biological males" and "biological females" only when quoting from the Executive Order. These terms are scientifically "imprecise" and are viewed as derogatory to transgender women and girls. *Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34 at 83 n.8 (2d Cir. 2023) (Judges Chin, Carney, Kahn, Lee, Pérez, dissenting) (referring to

defines "gender" as "the individual's biological sex at birth" and permits the Parks Department

to consider a birth certificate as identification of a participant's sex only when the birth

certificate was "filed at or near the time" of the participant's birth. (*Id*. at 2.)

The plain text of the Executive Order prohibits transgender[6] women and girls, as well as

any women and girls' sports teams that include them, from participating in women and girls'

sporting events on Nassau County Parks property. (*Id.* at 1–2.) Transgender women and girls are

only permitted to participate in sporting events designated as "male" or "coed." (*Id.*) By contrast,

the plain text of the Executive Order permits transgender men and boys to participate in any

sporting events on Nassau County Parks property, whether the events are designated as "female,"

"male," or "coed." (*Id.* at 2.) The Executive Order does not address people who may identify as

intersex or nonbinary. (*See* Defs.' Br. at 4.)

On March 1, 2024, the OAG's Civil Rights Bureau sent a letter to Blakeman indicating

that the office had reviewed the Executive Order and concluded that it is "in clear violation of

---

intervening parties as "transgender females" and transgender girls" rather than "biological males" (the term used by appellants) to "afford them the respect and dignity they are due" because "calling attention to a transgender person's biological sex by referring to them as a 'biological male' is harmful and invalidating" and because such terms are scientifically "imprecise") (citing Wylie C. Hembree, Peggy T. Cohen-Kettenis, et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102(11) J. Clinical Endocrinology & Metabolism, 3869, 3875 tbl. 1 (2017)); Glossary of Terms: Transgender, GLADD Media Reference Guide: 11th Edition, GLADD, https://glaad.org/reference/trans-terms/ (last visited Apr. 22, 2024); *see also Hecox v. Little*, 79 F.4th 1009, 1023–24 (9th Cir. 2023) ("[T]he [challenged] Act's definition of 'biological sex' is likely an oversimplification of the complicated biological reality of sex and gender.").

[6] This Opinion and Order uses the term "transgender" to refer to individuals whose gender identity does not correspond to their sex assigned at birth. The term "gender identity" refers to a person's sense of being male, female, neither, or some combination of both, which may or may not correspond to an individual's sex assigned at birth. *See* N.Y. Exec. Law § 292(35) ("The term 'gender identity or expression' means a person's actual or perceived gender-related identity, appearance, behavior, expression, or other gender-related characteristic regardless of the sex assigned to that person at birth, including, but not limited to, the status of being transgender.").

New York State anti-discrimination laws." (OAG Ltr. at 1, ECF No. 10-3.) In the letter, the OAG

demands rescission of the Executive Order within five business days and that Blakeman

"immediately produce any and all documents constituting the record supporting [his] decision to

issue the Order." (*Id*. at 3.) The OAG also states that "[f]ailure to comply with this directive may

result in further legal action by the OAG." (*Id*.)

According to the March 1, 2024 letter, facilities covered by the Executive Order "rang[e]

from general playing fields in parks to baseball, football, and soccer fields, basketball and tennis

courts, indoor and outdoor swimming pools, as well as ice rinks and shooting ranges" and

"would apply to approximately 100 venues." (*Id.* at 2.) The OAG asserts that the immediate

effect of the Order is "to force sports leagues to make an impossible choice: discriminate against

transgender women and girls, in violation of New York law, or find somewhere else to play."

(*Id.*) It argues that the Executive Order violates the New York Human Rights Law's prohibition

against discrimination on the bases of "sex" and "gender identity or expression" in places of

public accommodation, N.Y. Exec. Law §§ 292(9), 296(2), and its prohibition against

"'compel[ling]' others to discriminate in ways that will violate the Human Rights Law" under

N.Y. Exec. Law § 296(6). (OAG Ltr. at 2.) The OAG further argues that the Executive Order

violates the New York Civil Rights Law, which provides that "no person shall be subjected to

any discrimination in [their] civil rights" based on "sex . . . [or] gender expression or identity,"

N.Y. Civ. Rts. Law § 40-c, as well as the Equal Protection Clause of the New York State

Constitution. (OAG Ltr. at 2–3.)

Rather than respond to the letter, Plaintiffs filed suit in this Court on March 5, 2024. (*See*

Compl.) The Complaint pleads a single cause of action alleging that the OAG's March 1, 2024

letter, as well as any other actions by Defendants "to prevent enforcement of" the Executive

Order, violates the rights of "biological girls and women" under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. (Compl. ¶¶ 33–43.) Plaintiffs bring this claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, but do not cite 42 U.S.C. § 1983 ("Section 1983") or any other basis for the cause of action. (*Id*.) The Complaint alleges that the Executive Order advances the important government interest of "ensuring equality in women's athletics," and that the OAG's position "effectively vitiates biological females' right to equal opportunities in athletics as well as the right to a safe playing field by exposing biological females to the risk of injury by transgender women (i.e., biological males) as well as unfair competitive advantage." (*Id*. ¶¶ 29, 38.) It alleges that the New York Human Rights Law "is unconstitutional" as applied to the Executive Order because it purportedly "elevates transgender women to a level not recognized by Federal law in the athletics context all to the detriment of biological girls and women." (*Id*. ¶ 40.) Plaintiffs seek relief in the form of: (1) a declaration that Defendants' application of the New York Human Rights Law against the Executive Order violates the Equal Protection Clause;[7] (2) a declaration that the Executive Order "is valid under the United States Constitution, Federal law, and state law"; (3) a permanent injunction preventing "Defendants from taking any action to prevent" the County Plaintiffs "from implementing and enforcing" the Executive Order; and (4) costs, disbursements, reasonable attorney fees, and any further relief. (Compl. at 12.)

On March 7, 2024, the County Plaintiffs filed the TRO/PI Motion (ECF No. 10), seeking to bar Defendants from "taking further action" relating to the Executive Order, including by

---

[7] Although the March 1, 2024 letter set forth the OAG's position that the Executive Order violates both the New York Human Rights Law and the New York Civil Rights Law, Plaintiffs' requested declaratory relief concerns only the alleged unconstitutionality of the New York Human Rights Law as applied to the Executive Order. (*See* Compl. at 12.)

"initiating any legal proceedings and/or actions" against the County Plaintiffs. (Cnty. Pls.' Br. at 27; TRO/PI Mot. at 2.) The County Plaintiffs' supporting brief also requests an order "staying AG James' demand for document production . . . and declaring [the Executive Order] valid under the U.S. Constitution, Federal Law, and State Law." (Cnty. Pls.' Br. at 5.)[8] Blakeman attests that, without immediate injunctive relief, Nassau County "will suffer immediate and irreparable injury, loss, and damage in that women and girls in Nassau County will be discriminated against and their constitutional rights under the United States Constitution will be violated." (Blakeman Aff. ¶ 3, ECF No. 10-4.) According to Blakeman, without the Executive Order:

> [W]omen and girls will not receive equal and fair opportunities to obtain recognition and accolades, college scholarships, and numerous other long-term benefits that result from participating and competing in athletic endeavors; women and girls will not have access to a supportive and safe environment for the purpose of engaging in sports; and biological males will have an unfair advantage over women and girls in sports.

(*Id.* ¶ 4.)

The Court permitted Defendants and the Individual Plaintiffs to respond to the County Plaintiffs' TRO/PI Motion by March 22, 2024. (Elec. Order, Mar. 23, 2024.) Defendants opposed the Motion (Defs.' Br.), but the Individual Plaintiffs did not provide a brief or factual submissions addressing any position on the Motion (*see* Elec. Order, Mar. 23, 2024). The Court further permitted the County Plaintiffs the opportunity to submit a reply brief addressing the arguments raised in Defendants' opposition brief by March 28, 2024. (*Id.*; Elec. Order, Mar. 26, 2024.) The County Plaintiffs filed a timely reply. (Cnty. Pls.' Reply, ECF No. 21.)

---

[8] Although this requested declaration is part of the ultimate relief sought in the Complaint (Compl. at 12), it is not identified as a part of the preliminary relief requested in the Order to Show Cause or proposed TRO. (*See* ECF Nos. 10, 17.)

The County Plaintiffs have not provided any factual submissions addressing how the Executive Order is implemented in practice. Their brief asserts that permit applicants must "merely indicate whether said [athletic] competition is male, female, or coed and . . . supply a copy of the applicants['] 'athlete participation policy.'" (Cnty. Pls.' Br. at 6.) The "athlete participation policy" has not been introduced into evidence; nor have the County Plaintiffs provided any sworn statements about what information applicants must provide on this document to ensure compliance with the terms of the Executive Order or how applicants procure that information from their participants. The record is further silent as to whether any athletic/sports entity has applied for a permit to use Nassau County Parks property since the enactment of the Executive Order. The County Plaintiffs' brief asserts that "[n]o permit has been denied since the County's Executive Order was executed." (*Id.*)

## VENUE AND JURISDICTION

Venue is proper under 28 U.S.C. § 1391(b)(2) because, as described above, a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

There is no dispute that this Court has personal jurisdiction over Defendants. New York State and the OAG are clearly state entities and James is sued in her role as NY Attorney General—a state official.

Plaintiffs assert that this Court has federal question jurisdiction over Plaintiffs' claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Fourteenth Amendment pursuant to 18 U.S.C. § 1331. (Compl. ¶¶ 12, 34–35.) Defendants challenge Plaintiffs' standing to bring this claim under Article III of the U.S. Constitution. (Defs.' Br. at 13–14.) "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 283 (2d Cir. 2023) (quotation marks omitted). As

discussed in detail below, this Court lacks subject matter jurisdiction because Plaintiffs lack standing to bring the sole claim pled in the Complaint (Compl. ¶¶ 33–34). *Bohnak*, 79 F.4th at 283; *see infra*, Section I.C.

## STANDARD OF REVIEW

The Second Circuit has long established that a party seeking a preliminary injunction must show three things: (1) irreparable harm in the absence of an injunction pending resolution of the action, (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party, and (3) that a preliminary injunction is in the public interest. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018). The Second Circuit has "consistently applied the likelihood-of-success standard to cases challenging government actions taken in the public interest pursuant to a statutory or regulatory scheme," in lieu of the lower standard requiring a showing only of serious questions on the merits and a balance of hardships decidedly favoring the moving party. *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 n.13 (2d Cir. 2021), *opinion clarified*, 17 F.4th 368 (2d Cir. 2021); *N. Am. Soccer League*, 883 F.3d at 37; *see, e.g.*, *Gazzola v. Hochul*, 88 F.4th 186, 194 (2d Cir. 2023) (requiring showing of a likelihood of success on the merits on preliminary injunction motion against New York commercial regulations on firearms and ammunition sales and related state licensing scheme and background-check and training requirements), *petition for cert. filed*, No. 23-995 (Mar. 12, 2024). Courts apply the same standard when considering an application for a TRO. *See e.g.*, *Dukes v. Cold Spring Harbor Cent. Sch. Dist. Bd. of Educ.*, No. 20CV4532JMAST, 2021 WL 308341, at *4 (E.D.N.Y. Jan. 29, 2021); *Hopkins Hawley LLC v. Cuomo*, No. 20-CV-10932 (PAC), 2021 WL 8200607, at *1 (S.D.N.Y. Jan. 8, 2021).

The Second Circuit has made clear that when a party seeks "mandatory" rather than "prohibitory" preliminary relief, "the likelihood-of-success and irreparable-harm requirements become more demanding still, requiring that the plaintiff show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, No. 23-690, 2024 WL 1145347, at *3 (2d Cir. Mar. 18, 2024) (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)) (quotation marks and citations omitted). A mandatory temporary restraining order typically requires the non-movant to take some action, whereas a prohibitory temporary restraining order "typically requires the non-movant to refrain from taking some action." *Id.* "This higher standard is particularly appropriate when a plaintiff seeks a preliminary injunction against a government body . . . ." *Weinstein v. Krumpter*, 120 F. Supp. 3d 289, 297 (E.D.N.Y. 2015) (citations omitted); *see also C.C. v. New York City Dep't of Educ.*, No. 22-0459, 2023 WL 2545665, at *2 (2d Cir. Mar. 17, 2023) (recognizing that this higher standard applies to a request for a mandatory injunction against governmental action) (citing *Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021)). Determining whether requested preliminary relief is mandatory or prohibitory "is sometimes unclear":

> In borderline cases, essentially identical injunctions can be phrased either in mandatory or prohibitory terms. We have therefore explained that [p]rohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it. In this context, the status quo is really the status quo *ante* – that is, the last actual, peaceable[,] uncontested status which preceded the pending controversy.

*Daileader*, 2024 WL 1145347, at *3 (citing *N. Am. Soccer League*, 883 F.3d at 36 n.4, 37 n.5) (quotation marks and citations omitted).

The County Plaintiffs contend, without explanation, that they may secure a temporary restraining order by meeting the lowest standard, which requires showing only "sufficiently

serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor." (Cnty. Pls.' Br. at 23.) Defendants argue that the highest standard applicable to mandatory injunctions—requiring a showing of a "clear or substantial likelihood of success on the merits"—applies because the requested relief "will affect government action taken in the public interest pursuant to a statutory or regulatory scheme." (Defs.' Br. at 6.) Defendants do not explicitly address, however, whether the requested preliminary relief is mandatory or prohibitory in nature.

The lesser "serious questions" standard is inapplicable here because the requested temporary restraining order will affect the OAG and James' enforcement of the New York Human Rights Law, which constitutes "government action taken in the public interest pursuant to a statutory or regulatory scheme." *We the Patriots USA, Inc.*, 17 F.4th at 279 n.13; *see* N.Y. Exec. Law § 292 *et seq.*; *id.* § 63(1). The Court does not resolve at this time, however, whether the TRO/PI Motion seeks mandatory or prohibitory relief. The status quo *ante*—the last actual, peaceable, uncontested status that preceded the pending controversy—was shortly after Blakeman issued the Executive Order and before the OAG issued the March 1, 2024 letter calling for the Executive Order's rescission and requesting the documents supporting its issuance. At that time, James and the OAG could exercise discretion under New York law to bring an enforcement action against the County Plaintiffs under the New York Human Rights Law. *See* N.Y. Exec. Law § 63(1). On the one hand, the County Plaintiffs' requested temporary restraining order is prohibitory because it would require the "non-movant to refrain from taking some action"—here, OAG and James' action to enforce state anti-discrimination laws. *Daileader*, 2024 WL 1145347, at *3. On the other hand, the requested temporary restraining order is mandatory because it would upend the status quo in which the New York Legislature has

granted the NY Attorney General broad discretion to enforce the state's anti-discrimination laws. *See* N.Y. Exec. Law § 63. There is an additional question about whether the requested order may "provide the movant with substantially all the relief sought" and whether "that relief cannot be undone even if the defendant prevails at a trial on the merits," factors that weigh in favor of framing the requested TRO as mandatory. *Yang v. Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020).

The Court need not resolve these questions at this time because, as explained in this opinion, the County Plaintiffs fail to meet the lower "likelihood of success on the merits" standard applied to a motion for a temporary restraining order seeking prohibitory relief against government actions taken in the public interest pursuant to a statutory or regulatory scheme. *See, e.g.*, *We the Patriots USA, Inc.*, 17 F.4th at 279; *Gazzola*, 88 F.4th at 194.

## DISCUSSION

The County Plaintiffs fail to meet the standard for securing the "extraordinary remedy" of a temporary restraining order for two principal reasons. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) ("[A] preliminary injunction is an extraordinary remedy never awarded as of right.") (quotation marks omitted); *Gazzola*, 88 F.4th at 193–94 (same). First and foremost, the County Plaintiffs' TRO Motion fails to demonstrate a likelihood of success on the merits of the sole equal protection claim pled in the Complaint. Based on the record before the Court, the claim is nonjusticiable under the doctrine of Eleventh Amendment sovereign immunity, the application of Rule 17(b) and New York's capacity-to-sue rule, and the requirements of Article III standing. Second, the County Plaintiffs' submissions fail to show that they will suffer irreparable harm without the requested temporary restraining order.

## I.  Likelihood of Success on the Merits

The Plaintiffs' single claim for declaratory and injunctive relief under the Equal Protection Clause suffers from defects that render it nonjusticiable. The Eleventh Amendment affords New York and the OAG sovereign immunity from Plaintiffs' claim for injunctive and declaratory relief and bars any claim for retrospective declaratory relief against James. Additionally, the County Plaintiffs lack the capacity to sue all Defendants under Rule 17(b), Fed. R. Civ. P., and New York law. Furthermore, the record does not establish that any of the Plaintiffs—whether Nassau County, Blakeman, or the Individual Plaintiffs—have demonstrated an actual and imminent injury that is concrete and particularized as required for Article III standing to bring the equal protection claim pled in the Complaint.

### A.  Eleventh Amendment Sovereign Immunity

Defendants argue that the Eleventh Amendment bars Plaintiffs' claim for injunctive and declaratory relief against New York and the OAG, as well as any claim for "retroactive relief" against James for conduct taken in her official capacity as the NY Attorney General. (Defs.' Br. at 8–9.) The County Plaintiffs fail to address the Eleventh Amendment in their opening brief and to respond to any of Defendants' arguments in their reply brief in support of the TRO Motion. (*See generally* Defs.' Br. at 8–9; Cnty. Pls.' Reply.) Defendants are correct. The Eleventh Amendment bars almost all aspects of Plaintiffs' equal protection claim, with the sole exception of an equal protection claim for injunctive and prospective declaratory relief against James in her official capacity as the NY Attorney General.[9]

---

[9] Defendants do not argue that Eleventh Amendment sovereign immunity bars any claim for injunctive relief by Plaintiffs against James for conduct taken in her official capacity. (Defs' Br. at 8–9). As discussed below, Plaintiffs' equal protection claim for injunctive relief against James

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. Though not set forth in the text, the Eleventh Amendment also bars "suits in federal court against a state brought by that state's own citizens." *Mary Jo C. v. New York State & Loc. Ret. Sys.*, 707 F.3d 144, 151 (2d Cir. 2013). Eleventh Amendment sovereign immunity also applies to suits by a municipality—such as Nassau County—against a state. *See Monroe Cnty. v. State of Fla.*, 678 F.2d 1124, 1131 (2d Cir. 1982) (holding that a New York county bringing suit against Florida is a "Citizen of another State" within the meaning of the Eleventh Amendment), *cert. denied*, 459 U.S. 1104 (1983); *see also Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226 (holding that the Eleventh Amendment bars a county's cross-claim against New York for indemnification), *reh'g denied*, 471 U.S. 1062 (1985). Eleventh Amendment sovereign immunity applies not just to lawsuits filed in federal court against states themselves, but also to "certain actions against state agents and instrumentalities." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)); *see also Mary Jo C.*, 707 F.3d at 151–52 (same). An entity "asserting Eleventh Amendment immunity . . . bear[s] the burden of demonstrating entitlement." *Leitner*, 779 F.3d at 134. "[T]he question is whether the state instrumentality is independent or whether it is an 'arm of the state.'" *Id.*; *see, e.g.*, *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (holding that the New York State Unified Court System is an "arm of the State" entitled to Eleventh Amendment sovereign immunity). The Second Circuit has applied

---

for conduct taken in her official capacity is permissible under the exception to Eleventh Amendment sovereign immunity established in *Ex parte Young*, 209 U.S. 123 (1908).

two different tests to answer this question. *Leitner*, 779 F.3d at 134–35, 137.[10] Both tests are

ultimately guided by what the Supreme Court has recognized are the Eleventh Amendment's

"twin reasons for being": the need to "preserv[e] the state's treasury and protect[] the integrity of

the state." *Id.* at 134 (citing *Hess v. PATH*, 513 U.S. 30, 47–48 (1994)).

Entities shielded from suit by the Eleventh Amendment "may not be sued in federal court

unless they have waived their Eleventh Amendment immunity, or unless Congress has

abrogate[d] the states' Eleventh Amendment immunity when acting pursuant to its authority

under Section 5 of the Fourteenth Amendment." *Gollomp*, 568 F.3d at 366 (quotation marks

omitted). The Eleventh Amendment thus "generally bars suits in federal court" against "non-

consenting states." *Leitner*, 779 F.3d at 134. This bar applies to federal court suits against a state

and its agents and instrumentalities "regardless of the nature of the relief sought." *74 Pinehurst*

*LLC v. New York*, 59 F.4th 557, 570 (2d Cir. 2023), *cert. denied*, No. 22-1130, 2024 WL 674658

---

[10] The Second Circuit has recognized that both arm-of-the-state tests "have much in common"
and that "the choice of test is rarely outcome-determinative." *Leitner*, 779 F.3d at 137. The first
arm-of-the-state test requires courts to consider (1) "the extent to which the state would be
responsible for satisfying any judgment that might be entered against the defendant entity," and
(2) "the degree of supervision exercised by the state over the defendant entity." *Clissuras v. City
Univ. of N.Y.*, 359 F.3d 79, 82 (2d Cir. 2004) (quotation marks omitted). The second arm-of-the-
state test requires consideration of six factors:

> (1) how the entity is referred to in the documents that created it; (2) how the governing
> members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's
> function is traditionally one of local or state government; (5) whether the state has a veto
> power over the entity's actions; and (6) whether the entity's obligations are binding upon
> the state.

*Mancuso v. New York State Thruway Auth.*, 86 F.3d 289, 293 (2d Cir. 1996). If the factors from
the second test do not lean in a clear direction, a court must consider "the twin reasons for the
Eleventh Amendment: (1) protecting the dignity of the state, and (2) preserving the state
treasury." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 240 (2d Cir.
2006) (citing *Mancuso*, 86 F.3d at 293). If consideration of these two reasons does not clarify the
determination, the court then focuses on "whether a judgment against the governmental entity
would be paid out of the state treasury." *Id.* at 241.

(U.S. Feb. 20, 2024); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 120 (1984) ("[I]f a § 1983 action alleging a constitutional claim is brought directly against a State, the Eleventh Amendment bars a federal court from granting *any relief* on that claim.") (emphasis supplied). Accordingly, states and their agents and instrumentalities are immune from suits seeking monetary damages and injunctive relief, *McGinty v. New York*, 251 F.3d 84, 91 (2d Cir. 2001) (citations omitted), as well as declaratory relief, *Ashmore v. Prus*, 510 F. App'x 47, 48 (2d Cir. 2013) (citing *Pennhurst*, 465 U.S. at 100–01); *Manners v. New York*, 175 F.3d 1008, 1999 WL 96136 at *1 (2d Cir. 1999) (summary order) (citing *Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993)).

Notwithstanding the Eleventh Amendment's bar to federal court suits against states and their agents and instrumentalities, a plaintiff may sue a state official acting in their official capacity "for prospective, injunctive relief from violations of federal law" under the doctrine established by the Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908). *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 94 (2d Cir. 2007). The *Ex parte Young* exception applies to a claim against a state official when the "complaint (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (citing *Verizon Maryland Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002)) (quotation marks omitted). The *Ex parte Young* exception does not apply if a plaintiff seeks declaratory relief that "would have the same effect as an award of damages against the state." *Williams v. Marinelli*, 987 F.3d 188, 197 (2d Cir. 2021) (citing *Green v. Mansour*, 474 U.S. 64, 73 (1985)); *see also Bythewood v. New York*, No. 22-2542-CV, 2023 WL 6152796, at *1 (2d Cir. Sept. 21, 2023) ("Retrospective declaratory relief cannot otherwise serve as an end run around the Eleventh Amendment's bar on retrospective

awards of monetary relief." (citing *Ward v. Thomas*, 207 F.3d 114, 120 (2d Cir. 2000))

(quotation marks omitted).

### 1) Plaintiffs' Claim against New York and the OAG

The Eleventh Amendment precludes Plaintiffs' claim against New York and the OAG

because New York has not waived its Eleventh Amendment immunity to claims brought under

the Fourteenth Amendment's Equal Protection Clause and Congress has not abrogated that

immunity. *Gollomp*, 568 F.3d at 366; *Barone v. Laws.' Fund for Client Prot.*, 2023 WL

1975783, at *2 (2d Cir. 2023).

First, the Eleventh Amendment applies to both New York and the OAG. As one of the

"United States," New York is squarely covered by the plain text of the Eleventh Amendment.

U.S. Const. Amend. XI. The OAG also falls within the Amendment's reach because it "is

unquestionably an arm of the State of New York for purposes of Eleventh Amendment

immunity." *Giordani v. U.S. Dep't of Just.*, No. 22-CV-642 (AMD) (LB), 2022 WL 17488494,

at *6 (E.D.N.Y. Dec. 7, 2022) (citation omitted), *appeal dismissed* (Nov. 6, 2023); *see also*

*Butler v. New York State Dep't of L.*, 211 F.3d 739, 746 (2d Cir. 2000) (affirming dismissal of

employment discrimination claim against the OAG (referred to as the "New York State

Department of Law") as barred by Eleventh Amendment sovereign immunity); *Mitchell v. New*

*York*, No. 23-705, 2024 WL 319106, at *2 (2d Cir. Jan. 29, 2024) (holding that "no relief, either

legal or equitable, is available against . . . the New York Attorney General" because it is entitled

to Eleventh Amendment immunity); *Smith v. United States*, 554 F. App'x 30, 31 (2d Cir. 2013)

(affirming district court's dismissal of a suit against New York and the NY Attorney General as

barred by the Eleventh Amendment); *Petreykov v. Vacco*, 159 F.3d 1347 (2d Cir. 1998) (same);

*Rivera v. United States Citizenship & Immigr. Servs.*, No. 19-CV-3101, 2020 WL 4705220, at *9

(S.D.N.Y. Aug. 12, 2020) (collecting district court decisions holding that the Eleventh

Amendment bars claims against the OAG).[11]

Second, Congress has not abrogated the States' Eleventh Amendment immunity as to

Plaintiffs' Fourteenth Amendment claim. The Complaint appears to assert a claim under the

Declaratory Judgment Act and the Fourteenth Amendment's Equal Protection Clause without

identifying a valid cause of action under which Plaintiffs bring this claim. (*See generally*

Compl.)[12] Even if the Court were to liberally construe the Complaint to assert a Fourteenth

---

[11] Given the weight of this authority, the Court does not address all of the factors of the *Mancuso* arm-of-the-state test, but recognizes that the first four *Mancuso* factors weigh in favor of finding the OAG to be an arm of the state. The OAG is referenced in the New York Constitution and its duties and powers are established in New York statutes (the first *Mancuso* factor). *See* N.Y. Const. art. V, §§ 1, 4; N.Y. Exec Law § 60 *et seq.* The NY Attorney General is elected in "the same general election as the governor" (the second *Mancuso* factor). N.Y. Const. art. V, § 1. The budget for the office comes from the New York Legislature (the third *Mancuso* factor). *See* N.Y. Exec. Law § 60. The powers and duties of the NY Attorney General are traditionally those of state government (the fourth *Mancuso* factor). *See e.g.*, N.Y. Exec. Law § 63 ("The attorney-general shall . . . [p]rosecute and defend all actions and proceedings in which the state is interested . . . and have charge and control of all the legal business of the departments and bureaus of the state . . . in order to protect the interest of the state . . . .").

[12] The Complaint does not cite 42 U.S.C. § 1983, which established a cause of action for bringing constitutional claims against people acting under color of state law. (*See* Compl. ¶ 14; *id.* at 9.) The only statute Defendants' cite—the Declaratory Judgment Act, 28 U.S.C. § 2201—"does not create an independent cause of action." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244–45 (2d Cir. 2012). In their reply brief, the County Plaintiffs state that the claim "was in fact asserted under the Equal Protection Clause" (Cnty. Pls.' Reply at 1), but point to no authority for the proposition that there is an implied cause of action against state governments under the Fourteenth Amendment. *Cf. Pauk v. Bd. of Trs. of City Univ. of New York*, 654 F.2d 856, 864 (2d Cir. 1981) (collecting cases where courts have found implied causes of action for certain constitutional violations, but not in the Equal Protection Clause context); *Turpin v. Mailet*, 591 F.2d 426 (2d Cir. 1979) (abrogating prior Second Circuit decision finding an implied cause of action under the Fourteenth Amendment for suits against municipalities). Even if Plaintiffs could bring an implied cause of action under the Fourteenth Amendment, the Supreme Court has held that Congress did not express an intent to abrogate states' Eleventh Amendment immunity by ratifying the Fourteenth Amendment itself. *See Santiago v. New York State Dept. of Corr. Servs.*, 945 F.2d 25, 30–32 (2d Cir. 1991) ("[W]e are unpersuaded that the states, in ratifying the Fourteenth Amendment, waived their Eleventh Amendment immunity . . . .").

Amendment claim pursuant to 42 U.S.C. § 1983, it is well established that "Congress did not abrogate the state's Eleventh Amendment immunity by enacting 42 U.S.C. § 1983." *Barone*, 2023 WL 1975783, at *2 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989)).

Third, there is no indication that New York has waived its immunity by "voluntarily invok[ing] federal court jurisdiction, or else . . . mak[ing] a clear declaration that it intends to submit itself to federal court jurisdiction." *Kelly v. New York State Unified Ct. Sys.*, No. 21-1633, 2022 WL 1210665, at *2 (2d Cir. Apr. 25, 2022) (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–76 (1999)) (brackets omitted); *see also, e.g.*, *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 37–38 (2d Cir. 1977) (finding that clause in interstate charter permitting New York to "sue and be sued," was not a clear declaration that New York intended to waive sovereign immunity).

Fourth, the Eleventh Amendment applies to the injunctive and declaratory relief Plaintiffs seek through their equal protection claim against New York and the OAG, as well as the specific relief they seek on the TRO/PI Motion. Plaintiffs' requests for a temporary restraining order, preliminary injunction, and permanent injunction all include requests for injunctive relief that is squarely barred by the Eleventh Amendment. *See McGinty*, 251 F.3d at 91 (holding that the Eleventh Amendment bars claims for "injunctive relief" against nonconsenting states).[13] Plaintiffs' request for a declaration that Defendants' application of the New York Human Rights Law to the Executive Order violates the Fourteenth Amendment and a declaration that the

---

[13] As discussed, the Complaint requests a permanent injunction barring Defendants from "taking any action" against implementation and enforcement of the Executive Order. (Compl. at 12). Plaintiffs also seek a temporary restraining order and preliminary injunction barring Defendants from "taking further legal action" and "from initiating any legal proceedings and/or actions against" the County Plaintiffs, and enjoining Defendants "from obtaining any and all documents produced or maintained by" the County Plaintiffs. (Proposed TRO at 1.)

Executive Order is lawful under federal and state law concern declaratory relief that is also barred by the Eleventh Amendment. *See Ashmore*, 510 F. App'x at 48; *Manners*, 1999 WL 96136 at *1.

Accordingly, Plaintiffs' equal protection claim for declaratory and injunctive relief against Defendants New York and the OAG are barred by Eleventh Amendment sovereign immunity.

## 2) Claims against Defendant James, in her Capacity as NY Attorney General

Defendants argue that any claims for "retroactive relief" against Defendant James acting in her official capacity are also barred by Eleventh Amendment sovereign immunity. (Defs.' Br. at 9.) This raises the question of whether any part of Plaintiffs' claim against James withstands Defendants' invocation of immunity.

The Complaint by its caption sues James "as attorney General of the State of New York" and its allegations solely address conduct by James' staff at the OAG, both of which suggest that Plaintiffs sue James only in her official capacity, rather than in her individual capacity. (*See* Compl. at 1.) The Complaint's request for a declaration that Defendants' application of the New York Human Rights Law to the Executive Order violates the Equal Protection Clause could be construed to include a request for a declaration that the OAG's March 1, 2024 letter violated the Equal Protection Clause. (*See* Compl. ¶ 41 (alleging that "[i]n fact, the cease-and-desist order violates the constitutional rights of biologically [sic] girls and women who are a federally recognized protected class")). The Eleventh Amendment bars this demand for retrospective declaratory relief against James in her official capacity. *Williams*, 987 F.3d at 197; *Green*, 474 U.S. at 73; *Bythewood*, 2023 WL 6152796, at *1.

At least a portion of the requested declaratory relief pled against James, however, is forward looking. That portion seeks to establish that the Executive Order is lawful going forward and that the New York Human Rights Law's provisions prohibiting discrimination on the bases of sex and gender identity and expression are invalid. These aspects of Plaintiffs' declaratory relief claim against James, as well as the request for an injunction barring James from taking any action to prevent implementation of the Executive Order, fall within the *Ex parte Young* exception to Eleventh Amendment sovereign immunity. *See Seneca Nation*, 58 F.4th at 672 n.39; *Rowland*, 494 F.3d at 95–98. As discussed below, however, those aspects of Plaintiffs' declaratory relief claim against James are nonjusticiable for other reasons.

### B.  The County Plaintiffs' Capacity to Sue

Defendants argue that both Nassau County and Blakeman, who sues in his official capacity as the Nassau County Executive, lack the capacity to sue Defendants for the equal protection claim pled in the Complaint.

Rule 17(b) of the Federal Rules of Civil Procedure governs the capacity of an entity to bring a claim in federal court. *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 954 F. Supp. 2d 127, 136 (E.D.N.Y. 2013), *aff'd* 868 F.3d 104 (2d Cir. 2017). "Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing." *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 403 F. Supp. 3d 257, 267 (S.D.N.Y. 2019). As relevant here, the "[c]apacity to sue or be sued is determined . . . by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(3); *Orraca v. City of New York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995) (noting that under Rule 17(b), "the capacity of a governmental entity to sue or be sued is a question of state law"); *see, e.g.*, *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d 58, 63–64 (2d Cir. 2017) (applying New York law to determine whether a public benefit corporation had the capacity to challenge a New

York claim-revival statute under the New York Constitution). "[A] party must maintain its capacity to sue throughout litigation, and lack of capacity is grounds for dismissal." *Sonterra*, 403 F. Supp. 3d at 267 (quotation marks and citation omitted). If not raised by motion, a defense of lack of capacity to sue "can be waived." *City of New York v. State of New York*, 86 N.Y.2d 286, 292 (1995).

New York follows the "traditional" capacity-to-sue rule, according to which "municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation." *City of New York*, 86 N.Y.2d at 289; *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d at 63. This rule "flows" from the recognition that "municipal corporate bodies—counties, towns and school districts—are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as its agents." *City of New York*, 86 N.Y.2d at 289. The Second Circuit has recognized that "[t]his rule is also a necessary outgrowth of separation of powers doctrine: it expresses the extreme reluctance of courts to intrude in the political relationships between the Legislature, the State and its governmental subdivisions." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d at 63 (citing *City of New York*, 86 N.Y.2d at 296). Thus, New York counties "cannot have the right to contest the actions of their principal or creator affecting them in their governmental capacity or as representatives of their inhabitants." *City of New York*, 86 N.Y.2d at 290. "Municipal officials . . . suffer the same lack of capacity to sue the State with the municipal corporate bodies they represent." *Id.* at 291.[14]

---

[14] As discussed later in this Opinion and Order, *see* Section I.C n.18, the Second Circuit has employed a similar rationale in finding that political subdivisions lack "standing" to sue their

The New York Court of Appeals recognizes only four limited exceptions to the general

rule that municipal corporate entities and their officers lack capacity to mount constitutional

challenges to State action and legislation:

> (1) [where there is] an express statutory authorization to bring such a suit; (2)
> where the State legislation adversely affects a municipality's proprietary interest
> in a specific fund of moneys; (3) where the State statute impinges upon "Home
> Rule" powers of a municipality constitutionally guaranteed under article IX of the
> State Constitution; and (4) where the municipal challengers assert that if they are
> obliged to comply with the State statute they will by that very compliance be
> forced to violate a constitutional proscription.

*City of New York*, 86 N.Y.2d at 291–92 (quotation marks and citations omitted); *see also In re*

*World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d at 63–64. The New York Court

of Appeals has emphasized that these four exceptions are "narrow." *In re World Trade Ctr.*

*Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d 377, 387 (2017). Thus, the capacity-to-sue rule

has been applied to bar:

> public entities from challenging a wide variety of state actions, such as, e.g., the
> allocation of state funds amongst various localities, the modification of a village
> operated hospital's operating certificate, the closure of a local jail by the State,
> special exemptions from local real estate tax assessments, laws mandating that
> counties make certain expenditures, state land use regulations and state laws
> requiring electronic voting systems to be installed at polling places in lieu of
> lever-operated machines.

*Id*. (citations to New York Court of Appeals decisions omitted).

Defendants have timely raised the County Plaintiffs' lack of capacity to sue in their

opposition to the TRO/PI Motion and in a timely filed Motion to Dismiss the Complaint. (*See*

Defs.' Br. at 9; Defs.' Mem. Supp. Mot. Dismiss at 9, ECF No. 20-1.) Under well-established

New York law, both Nassau County and Blakeman lack the capacity to sue Defendants for the

---

state creators in a challenge to a state statute under the Fourteenth Amendment. *See Tweed-New*
*Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 n.7 (2d Cir. 2019); *Aguayo v. Richardson*, 473
F.2d 1090, 1101 (2d Cir. 1973).

sole claim pled in the Complaint. Plaintiffs explicitly seek a ruling from this Court that Defendants violate the rights of women and girl athletes to equal protection by applying state anti-discrimination laws to the Executive Order. (Compl. ¶¶ 35–41; *id*. at 12.) Blakeman attests that he and Nassau County bring this suit to vindicate the rights of women and girls in Nassau County. (Blakeman Aff. ¶¶ 3–4.) As a subdivision and creation of Defendant New York, Nassau County lacks the authority to bring such a claim "contest[ing] the actions of [its] principal or creator affecting [it] in [its] governmental capacity or as representatives of [its] inhabitants." *City of New York*, 86 N.Y.2d at 290. Because Blakeman sues in his role as Nassau County's top official, he too lacks the authority to bring such a claim. *See id*. at 291 ("Municipal officials . . . suffer the same lack of capacity to sue the State with the municipal corporate bodies they represent.").

The County Plaintiffs fail to show that any of the four limited exceptions to New York's capacity-to-sue rule apply to their claim. First, they do not identify any express statutory language or legislative history showing that the New York Legislature intended to confer upon a county or a county executive the capacity to sue Defendants under the Fourteenth Amendment for any type of relief, much less the specific relief sought in the Complaint. *See e.g*., *City of New York*, 86 N.Y.2d at 289 (holding that the New York capacity-to-sue doctrine barred an equal protection claim by New York City, its Mayor, and other city entities against New York State and "various State officials" for public school funding issues where there was no "any express statutory language or legislative history" showing "capacity to bring suit challenging State legislation").[15]

---

[15] In arguing that the first exception to New York's capacity-to-sue rule does not apply to this case, Defendants contend that county and county officials generally lack capacity to assert a

This case does not trigger the second exception to New York's capacity-to-sue rule because the Plaintiffs do not show that the challenged provisions of the New York Human Rights Law adversely affect Nassau County's "proprietary interest in a specific fund of moneys." *City of New York*, 86 N.Y.2d at 287. There is no argument, much less a showing, that Plaintiffs' claims concern any Nassau County proprietary interest in any monetary fund.

The County Plaintiffs argue that the third exception to New York's capacity-to-sue rule—the "home rule" exception—applies to their Fourteenth Amendment equal protection claim because the New York Constitution's home rule provision "provides protections to local governments more extensive than those in many other states," the "laws enacted and adopted by the Nassau County Legislature carry the weight of state law," and that body delegated to the County Executive the authority to develop policies and procedures for the issuance of permits to use Nassau County Park property. (Cnty. Pls.' Reply at 2–3.) This argument is unpersuasive.

The New York Court of Appeals first recognized the home rule exception in *Town of Black Brook v. State*, 41 N.Y.2d 486 (1977), finding "a limited exception" to the rule that a municipality cannot attack "state legislative action affecting its powers" where the "local government's claim is based on one of the [home rule] protections of article IX [of the New York Constitution]." *Id.* at 487–89. This "limited exception" applies only to a municipality's claim that a state statute violates Article IX of the New York Constitution. *See id.* at 489 (noting that the home rule exception applies "when a home rule challenge is brought"); *New York Blue*

----

Fourteenth Amendment claim against a state because "they are not 'persons' within the meaning" of the Due Process Clause. (Defs.' Br. at 11 (citing *Cnty. of Chautauqua v. Shah*, 126 A.D.3d 1317, 1321 (4th Dep't 2015), *aff'd sub nom Cnty. of Chemung v. Shah*, 28 N.Y.3d 244 (2016)). The Court does not need to reach this question because the County Plaintiffs point to no express statutory language or legislative history demonstrating the New York Legislature's intent to grant them capacity to sue Defendants under the Fourteenth Amendment.

*Line Council, Inc. v. Adirondack Park Agency*, 86 A.D.3d 756, 758 (2011) (affirming the lower

court's ruling "that the municipal petitioners lack capacity to sue on all claims other than that

alleging a violation of their home rule powers" under "article IX of the N.Y. Constitution"),

*appeal dismissed* 17 N.Y.3d 947 (2011), *lv. denied* 18 N.Y.3d 806 (2012); *Town of Verona v.*

*Cuomo*, 136 A.D.3d 36, 41 (2015) (noting that the home rule exception "applies when a

municipality's claim is based upon a violation of its home rule powers").[16]

      Here, the home rule exception does not apply because the Complaint does not plead a

claim that the New York Human Rights law, as applied to the Executive Order, violates the

home rule provision of the New York Constitution. *See New York Blue Line Council*, 86 A.D.3d

at 759 (2011) (applying the home rule exception to hold that municipal entities only had capacity

to sue state agency under article IX of the N.Y. Constitution, but not to bring other claims); *Town*

*of Black Brook*, 41 N.Y.2d at 489 (the home rule exception applies "when a home rule challenge

is brought"). The sole claim set forth in the Complaint concerns an alleged violation of the Equal

Protection Clause and the Declaratory Judgment Act. (Compl. ¶¶ 33–43.) Without providing any

legal authority, the County Plaintiffs appear to argue that the home rule exception permits a

municipality and a municipal official to sue state defendants for claims *other than* an alleged

violation of the home rule protections of article IX of the New York Constitution. (*See* Reply Br.

at 2–3). This Court will not expand the home rule exception beyond the contours laid out by New

York courts. Based on the record before the Court, the home rule exception is inapplicable to this

---

[16] In *Town of Babylon, NY v. James*, No. 22-CV-1681(KAM)(AYS), 2023 WL 8734201
(E.D.N.Y. Dec. 19, 2023), *appeal docketed*, No. 24-177 (2d Cir. Jan. 22, 2024), however, the
parties brought claims against the NY Attorney General challenging a state statute under the
Fourteenth Amendment and article IX of the New York Constitution. The Court held that the
home rule exception did not apply to the case and did not explicitly distinguish whether it was
invoked with respect to both claims, or just the home rule claim. *Id.*

case and the County Plaintiffs lack capacity to sue Defendants for violation of the Fourteenth

Amendment's Equal Protection Clause and the Declaratory Judgment Act.

Finally, the fourth exception to the New York capacity-to-sue rule, which the County

Plaintiffs invoke on reply, does not apply. (*Id.*) The record does not establish that any action by

Defendants to enforce the New York Human Rights Law against the Executive Order would

compel either Nassau County or Blakeman "to violate a constitutional proscription." *City of New

York*, 86 N.Y.2d at 292. "New York courts have interpreted constitutional . . . proscriptions to be

something expressly forbidden . . . ." *Merola v. Cuomo*, 427 F. Supp. 3d 286, 292 (2019). The

County Plaintiffs broadly argue that rescission of the Executive Order would "allow[]

transgender females (biological males) to play sports with biological females, thereby violating

the constitutional rights of women as a protected class" and that rescission of the Executive

Order would "violate the rights afforded to [women] by Title IX." (Cnty. Pls.' Reply at 2.) The

County Plaintiffs' claim that rescission of the Executive Order would lead to Title IX violations

is confusing and out of place because that statute applies to educational institutions, and the

County Plaintiffs concede that Title IX does not apply to any sporting and athletic endeavors on

Nassau County Parks property. (Cnty. Pls.' Br. at 7 n.1.) The County Plaintiffs' assertion that

invalidation of the Executive Order would compel them to violate the equal protection rights of

women and girls is also unpersuasive. There is no record evidence that the County Plaintiffs

would be forced to violate the Equal Protection Clause's prohibition against intentional

discrimination with respect to any individual or group if Nassau County were to revert to the

procedures in place prior to enactment of the Executive Order for evaluating and granting

permits to use Nassau County Parks facilities. *See Howard v. City of New York*, 602 F. App'x

545, 547 (2d Cir. 2015) ("[T]he Equal Protection Clause[] only prohibits intentional . . .

discrimination.") (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000)). Indeed, the County Plaintiffs' argument suggests that prior to the Executive Order's enactment, the County Plaintiffs were violating the rights of women and girls by not having such a permitting process in place.

### C. Standing

Plaintiffs' equal protection claim boils down to the argument that the OAG's application of the New York Human Rights Law's prohibitions against discrimination on the bases of gender identity and expression to the Executive Order will cause violations of women and girls' rights under the Equal Protection Clause of the Fourteenth Amendment. (*See* Compl. ¶¶ 33–43.) Based on this claim, Plaintiffs seek a declaration that those provisions of the New York Human Rights Law are unconstitutional as applied to the Executive Order and that the Executive Order complies with federal and state law, and an injunction barring New York, the OAG, and James in her role as NY Attorney General, from taking any enforcement action that might lead to invalidation of the Executive Order. (*Id*. at 12.) The Court lacks jurisdiction over this claim under Article III of the Constitution because none of the Plaintiffs have standing to bring it.

Article III of the Constitution "limits the federal judicial power to deciding 'Cases' and 'Controversies.'" *Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34, 45 (2d Cir. 2023) (citing U.S. Const. art. III § 2). A case or controversy only exists when the plaintiff has "standing" to sue because they have "a personal stake in the outcome of the litigation." *Id.* (citing *United States v. Texas*, 599 U.S. 670 (2023)) (quotation marks omitted). In order to establish Article III standing, a plaintiff must show: "(1) that they suffered an injury in fact, (2) that the injury is fairly traceable to Defendants' challenged conduct, and (3) that the injury is likely to be redressed by a favorable judicial decision." *Id.* (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)) (quotation marks omitted). A "plaintiff[] must demonstrate standing for each claim that

they press and for each form of relief that they seek." *Id.* (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)). When seeking the extraordinary relief of a temporary restraining order or preliminary injunction, a plaintiff's burden to demonstrate standing "will normally be no less than that required on a motion for summary judgment." *Do No Harm v. Pfizer Inc.*, No. 23-15, 2024 WL 949506, at *7 (2d Cir. Mar. 6, 2024) (citing *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)). Accordingly, a plaintiff seeking such extraordinary relief "cannot rest on such mere allegations as would be appropriate at the pleading stage but must set forth by affidavit or other evidence specific facts" to establish injury-in-fact, redressability, and standing. *Id.* (citing *Cacchillo*, 638 F.3d at 404); *see also Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78–79 (2d Cir. 2021) (same); *Pers. v. United States*, No. 19 CIV. 154 (LGS), 2019 WL 258095, at *1 n.2 (S.D.N.Y. Jan. 18, 2019) (applying the same rule "in the context of a temporary restraining order, since the legal standard for granting temporary restraining orders and preliminary injunctions is the same").

In order to demonstrate an "injury in fact," a plaintiff must establish "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citations omitted); *see also Soule*, 90 F.4th at 45, 50 (citing *TransUnion*, 594 U.S. at 423). To be "concrete," an injury must be "real, and not abstract." *Id.* at 45. An injury is "particularized" only when it "affect[s] the plaintiff in a personal and individual way." *Id.* at 45–46 (citing *Spokeo*, 578 U.S. at 339). Lastly, an injury is "actual or imminent" where the injury "has actually happened or is certainly impending." *Id.* at 46, 50 (citing *Clapper v. Amnesty Int'l*

*USA*, 568 U.S. 398, 409 (2013), and then citing *Lujan*, 504 U.S. at 560–61) (quotation marks omitted).

Under these standards, the County Plaintiffs' submissions fail to establish that any Plaintiff—Nassau County, Blakeman, or K.E.M., whose claim is brought by the Mullens—have the required injury-in-fact for standing to bring a claim for the requested relief against Defendants. (Compl. at 12.)

### 1) County Plaintiffs

The County Plaintiffs' submissions fail to show they have standing for two reasons. First, in the Second Circuit, it is well established that a county lacks standing to challenge the constitutionality of a state statute under the Fourteenth Amendment. Blakeman does not demonstrate that he meets any exception to this rule for county officials who bring a legal claim in their official capacity. Second, the County Plaintiffs fail to show that they have any constitutional interest implicated by an OAG enforcement action against them related to the Executive Order. Even if an OAG enforcement action implicated the constitutional interest of third-parties—such as women and girls in Nassau County—the County Plaintiffs lack standing to assert an equal protection claim on behalf of these third-parties.

### a. Standing to Challenge the Constitutionality of the New York Human Rights Law

The County Plaintiffs lack standing to bring the equal protection claim pled in the Complaint. (*See* Compl. ¶¶ 33–43.) The Second Circuit has squarely held that "a political subdivision" of a state, such as a county, "does not have standing to sue its state under the Fourteenth Amendment." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 n.7 (2d Cir. 2019). "Political subdivisions of a state may not challenge the validity of a state statute under the Fourteenth Amendment." *City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973)

(citations omitted); *see also Aguayo v. Richardson*, 473 F.2d 1090, 1101 (2d Cir. 1973).[17]

Accordingly, under longstanding Second Circuit precedent, Nassau County, as a political

subdivision of New York, does not have standing to bring a claim for injunctive and declaratory

relief against any of the Defendants to challenge the OAG's application of the New York Human

Rights Law to the Executive Order under the Fourteenth Amendment's Equal Protection Clause.

*See Tweed*, 930 F.3d at 73 n.7.[18]

The Second Circuit has recognized a limited theory of standing—the so-called

"dilemma" theory—where, unlike a municipal corporation, a municipal official acting in their

official capacity may have standing to challenge a state statute under the Fourteenth Amendment

in certain circumstances. *See Bd. of Educ. of Mt. Sinai Union Free Sch. Dist. v. New York State*

*Tchrs. Ret. Sys.*, 60 F.3d 106, 112 (2d Cir. 1995) (citing *Bd. of Ed. of Cent. Sch. Dist. No. 1 v.*

*Allen*, 392 U.S. 236, 241 n.5 (1968)). The county official must demonstrate that "compliance

with state law will require them to violate their oaths to act constitutionally" and "that their

---

[17] By contrast, the Second Circuit held in *Tweed* that a political subdivision "may sue its state
under the Supremacy Clause" because that clause "raises unique federalism concerns." 930 F.3d
at 73. *Tweed* did not abrogate the Second Circuit's previous decisions in *Richardson* and *Aguayo*
as to a political subdivision's lack of standing to sue the state under the Fourteenth Amendment,
finding that those cases "present[ed] considerations different from those we consider here."
*Tweed*, 930 F.3d at 73 n.7. Accordingly, this Court is bound to follow the holdings of
*Richardson* and *Aguayo*. *See, e.g.*, *Town of Babylon*, 2023 WL 8734201, at *9 (finding that
under the *Tweed-Richardson-Aguayo* line of cases, a New York municipality is barred from
bringing due process and equal protection claims against a New York statute).

[18] The Second Circuit has characterized its analysis in the *Tweed-Richardson-Aguayo* line of
cases as concerning a political subdivision's "standing" to sue. *See Tweed*, 930 F.3d at 73 n.7;
*Aguayo*, 473 F.2d at 1100; *but see Richardson*, 473 F.2d at 929 (describing the rule as one where
the state lacks "privileges or immunities . . . [to] invoke in opposition to the will of its creator"
(citing *Williams v. Mayor & City Council of Baltimore*, 289 U.S. 36, 40 (1933))). This concept of
standing is distinct from New York law on the capacity to sue. *Sonterra*, 403 F. Supp. 3d at 267
("Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of
standing.").

positions as officials or funding for [their governmental entity] is in jeopardy if they refuse" to comply. *New York State Tchrs. Ret. Sys.*, 60 F.3d at 110–112 (finding that county officials who did not make such allegations lacked standing to bring Fourteenth Amendment and Contracts Clause claims against a state statute under the dilemma theory); *see also Merola v. Cuomo*, 427 F. Supp. 3d 286, 290–91 (N.D.N.Y. 2019).

Blakeman has failed to make the required showing. The County Plaintiffs have not set forth any evidence that an OAG enforcement action against them or even the eventual invalidation of the Executive Order would require Blakeman to violate his oath to act in accordance with the U.S. Constitution. Further, the County Plaintiffs have not submitted evidence showing that Blakeman's failure to comply with the New York Human Rights Law would likely result in the loss of his position as County Executive or a reduction in funding for Nassau County. Without evidence as to any "realistic threat of harm" to Blakeman if the OAG were to prevail on its theory that the Executive Order violates the New York Human Rights Law's prohibitions against discrimination on the bases of sex and gender identity and expression, the County Plaintiffs fail to establish any dilemma that could support Blakeman's standing to bring the Fourteenth Amendment claim pled in the Complaint. *New York State Tchrs. Ret. Sys.*, 60 F.3d at 112.

### b. Standing to Bring a Pre-Enforcement Challenge

Finally, the County Plaintiffs' submissions fail to establish their standing to bring a pre-enforcement equal protection claim challenging Defendants' application of the New York Human Rights Law to the Executive Order. The OAG has not initiated any legal action against Nassau County related to the Executive Order, although the March 1, 2024 letter conveys a demand that the County Plaintiffs rescind the Executive Order and produce the documentary record supporting its issuance or face "further legal action by the OAG." (OAG Ltr. at 3). For

standing to bring a pre-enforcement challenge, a plaintiff must show a "sufficiently imminent" injury-in-fact by demonstrating (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and (2) that there exists "a credible threat of prosecution thereunder." *Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)) (quotations omitted); *see, e.g.*, *Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687–691 (2d Cir. 2013) (holding that an organization had standing to bring a pre-enforcement First Amendment challenge to a state law where the plaintiff intended to engage in arguably protected speech and fear of violating the law had a chilling effect on that speech).

Defendants argue that implementation of the Executive Order does not implicate any "constitutional interest" of the County Plaintiffs themselves as required for a pre-enforcement challenge. (Defs.' Br. at 13.) Indeed, the County Plaintiffs have not pointed to any constitutional interest in maintaining the Executive Order that they themselves—rather than third parties— possess. *Cf. Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 525 (N.D. Cal. 2017) (finding that plaintiff counties demonstrated injury-in-fact to support standing for a pre-enforcement challenge to a federal executive order where plaintiffs' failure to comply would lead to the withdrawal of federal funding and "implicate a constitutional interest, the rights of states and local governments to determine their own local policies and enforcement priorities pursuant to the Tenth Amendment"). Instead, the County Plaintiffs allege that the OAG's enforcement actions will cause "women and girls in Nassau County" to face "discriminat[ion]" and violations of "their constitutional rights." (Blakeman Aff. ¶ 3.) The County Plaintiffs contend that they have standing because of an asserted "increased risk of future physical injury" to these third parties and rely on two district court decisions that address organizational standing. (Cnty. Pls.'

Br. at 23–24 (citing *Rural & Migrant Ministry v. United States EPA*, 510 F. Supp. 3d 138, 155 (S.D.N.Y. 2020), *amended and superseded by Rural & Migrant Ministry v. United States EPA*, 565 F. Supp. 3d 578 (S.D.N.Y. 2021); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 416 (S.D.N.Y. 2012)). The County is not an organization, however, and the County Plaintiffs do not provide any legal authority for the proposition that a municipality is treated as an organization for purposes of Article III standing. *Cf. City of Olmsted Falls, OH v. F.A.A.*, 292 F.3d 261, 268 (D.C. Cir. 2002) (assuming, without deciding, that a city may not establish standing on behalf of its citizens under the doctrine of organizational standing).

Moreover, even if Nassau County could avail itself of organizational standing doctrine, it would not be able to assert the equal protection rights of its female residents. It is well established in the Second Circuit that an organization lacks "standing to assert the rights of its members" under 42 U.S.C. § 1983. *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021) (quotation marks omitted); *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) ("It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983, as we have 'interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured.").

In the section of their reply brief addressing irreparable harm, the County Plaintiffs also argue that Nassau County and Blakeman will suffer an injury in the form of budget uncertainty due to the potential for "[a]n influx of [personal injury] lawsuits against the County" in the absence of the Executive Order, which "can result in millions of dollars of increase in the County budget in the form of settlements or verdicts." (Cnty. Pls.' Reply at 4.) These assertions, which are not alleged in the Complaint or supported by any evidence, are speculative and fail to

establish that enforcement of the Executive Order implicates any constitutional interest of the County itself. *Cf. County of Santa Clara*, 250 F. Supp. 3d at 528–29.

Accordingly, the record fails to show that the County Plaintiffs have standing to sue Defendants in a pre-enforcement claim that the New York Human Rights Law as applied to the Executive Order violates the Equal Protection Clause.

### 2) Individual Plaintiffs

In addition to the County Plaintiffs, the Individual Plaintiffs bring an equal protection claim against Defendants on behalf of their minor child, K.E.M. The record also fails to demonstrate an injury in fact supporting K.E.M.'s Article III standing to sue Defendants for the requested relief.

"Parents generally have standing to assert the claims of their minor children." *Nguyen v. Milliken*, No. 15-CV-0587 (MKB), 2016 WL 2962204, at *7 (E.D.N.Y. May 20, 2016) (citing *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001)) (quotation marks omitted); *see, e.g.*, *Soule*, 90 F.4th 51 (finding standing to bring Title IX claim for some requested injunctive relief where parents sued on behalf of their minor daughters). Where a parent asserts a claim in federal court on behalf of a child, the child must meet the requirements for Article III standing. *See id.* at 45–51 (analyzing whether the plaintiffs' children met the Article III requirements); *see also McCormick ex. Rel. v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 284 (2d Cir. 2004) (same).

There is no evidence in the record relating to K.E.M. The Complaint alleges only that K.E.M. is a "16-year-old biological female high school volleyball player" whose parents reside in Nassau County, and that "the Mullens are being forced into making the impossible determination whether to expose their 16-year-old daughter to the risk of injury by a transgender girl or simply to not play volleyball at all and forego whatever opportunities may present because

of her participation in volleyball." (Compl. ¶¶ 7–8, 30.) Plaintiffs have not put forward any evidence addressing whether K.E.M. plays on a volleyball team, whether that team engages in athletic endeavors on Nassau County Parks property, whether K.E.M. plays against or alongside transgender girls in those activities, or how rescission of the Executive Order will directly cause K.E.M. any concrete and imminent injury. The record lacks any evidence showing that K.E.M. has suffered, or imminently will suffer, an injury that is real, and not abstract and actual and imminent based on the OAG's application of the New York Human Rights Law to the Executive Order. The record thus fails to show that K.E.M has standing to seek a declaration that the New York Human Rights Law's prohibition against discrimination on the bases of gender identity and expression violates the Equal Protection Clause, a declaration that the Executive Order is lawful, or an injunction barring the OAG's enforcement of the New York Human Rights Law against the Executive Order. *See Do No Harm v. Pfizer Inc.*, 2024 WL 949506, at *7 (requiring plaintiff seeking preliminary relief to establish injury-in-fact, causation and redressability as required for standing by "affidavit or other evidence"); *Green Haven Prison*, 16 F.4th at 78–79 (same); *cf. Soule*, 90 F.4th 45 (finding plaintiffs established an injury in a Title IX action against a sports conference policy permitting athletes to play on teams consistent with their gender identities, where each plaintiff alleged, among other things, that they had competed in covered events and finished behind a transgender girl at least once).

Further, to the extent the Complaint alleges that the Individual Plaintiffs themselves will suffer an injury based on any violation of K.E.M.'s constitutional right to equal protection, they lack standing to pursue such a claim. *Nguyen*, 2016 WL 2962204, at *7 ("[A]lthough parents may sue on behalf of their minor child, they do not have standing to assert claims on their own behalf for a violation of their child's rights."); *see also T.P. ex rel. Patterson v. Elmsford Union*

*Free Sch. Dist.*, No. 11 CV 5133 VB, 2012 WL 860367, at *3 (S.D.N.Y. Feb. 27, 2012) (finding that a mother could not recover on a derivative claim under Section 1983 for the violation of her child's constitution rights).

### D.  The Merits of Plaintiffs' Equal Protection Claim

The County Plaintiffs cannot show a likelihood of success on the merits of their equal protection claim where, as here, the Court finds that (1)Eleventh Amendment sovereign immunity bars all aspects of the claim except for the portion seeking injunctive and prospective declaratory relief against James in her official capacity; (2) the County Plaintiffs lack the capacity to sue Defendants under Rule 17(b) and New York law; and (3) the record fails to show that Nassau County, Blakeman, or the Individual Plaintiffs have standing to bring the sole equal protection claim pled in the Complaint. In this context, the Court need not address the merits of Plaintiffs' equal protection challenge to Defendants' application of the New York Human Rights Law to the Executive Order. *See Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 134 (2d Cir. 2020) ("It is axiomatic that the federal courts should, where possible, avoid reaching constitutional questions.") (citation and quotation marks omitted); *see also Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.").

## II.   Irreparable Harm

The County Plaintiffs fail to show that they will suffer irreparable harm absent the requested TRO. A demonstration of irreparable harm is "the single most important prerequisite for the issuance of" a temporary restraining order. *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023) (internal citation omitted). That is because a temporary restraining order, like a preliminary injunction, seeks to maintain the status quo in order "to protect [the] plaintiff from

irreparable injury" while awaiting final decision on the merits. 11A Charles Alan Wright et al., Federal Practice and Procedure § 2947 (3d ed. April 2023 Update). Therefore, Plaintiffs must show that without a temporary restraining order, "they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *JTH Tax*, 62 F.4th at 672.

In cases concerning claims of constitutional injury, a bare assertion of a constitutional injury, without evidence "*convincingly show[ing]*" the existence of noncompensable damages, is insufficient to automatically trigger a finding of irreparable harm. *KM Enters. v. McDonald*, 11-cv-5098, 2012 WL 540955, at *4 (E.D.N.Y. Feb. 16, 2012) (citing *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir. 1988), *aff'd* 518 Fed. App'x 12 (2d Cir. 2013)) (emphasis supplied); *Weinstein v. Krumpter*, 120 F. Supp. 3d 289, 297 (E.D.N.Y. 2015) (same). By contrast, irreparable harm is satisfied when "the constitutional deprivation is convincingly shown and that violation carries noncompensable damages." *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012). Indeed, when "the violation of a constitutional right is the irreparable harm . . . the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giulani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000) (citation omitted); *Jansen v. New York City Dep't of Educ.*, No. 23-cv-6756, 2023 WL 6160691, at *3 (E.D.N.Y. Sept. 20, 2023), *recons. denied*, No. 23-cv-6756, 2023 WL 6541901 (E.D.N.Y. Oct. 6, 2023). Even in a case concerning an alleged constitutional injury, "it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights." *Time Warner Cable of New York City, a division of Time Warner Ent. Co., L.P. v. Bloomberg*

*L.P.*, 118 F.3d 917, 924 (2d Cir. 1997) (addressing motion for a preliminary injunction on a First Amendment claim).

The County Plaintiffs make three irreparable harm arguments—none of which are persuasive or supported by the record. First, Blakeman attests that if the Executive Order is rescinded, "women and girls in Nassau County" will "not have access to a supportive and safe environment" for sporting activities and will face "discriminat[ion]" and exclusion from the "long-term benefits" of participation in these endeavors, including "recognition and accolades, [and] college scholarships." (Blakeman Aff. ¶¶ 3–4; *see also* Cnty. Pls.' Reply at 3.) The County Plaintiffs have not put forward evidence about any specific women and girls in Nassau County who would face an imminent threat of physical injury, discrimination, or exclusion from recognition, accolades, or college scholarships, or any other long-term benefit from any current or future athletic activities on Nassau County Parks property in the absence of a temporary restraining barring the OAG from securing documents supporting the Executive Order's issuance and from exercising discretion to take legal action against the Executive Order, or even in the event the Executive Order is rescinded. As discussed above, the record provides no facts addressing whether K.E.M. plays on a volleyball team that uses Nassau County Parks property or involves the participation of transgender women or girls, much less that any transgender women or girls pose to K.E.M. an actual or imminent threat of either physical injury or exclusion from recognition or other benefits from athletic activities. Instead, the County Plaintiffs rely on several media reports of injuries to cisgender women and girls in athletic endeavors with transgender women and girls outside of Nassau County (and even outside of New York) (*see* TRO/PI Motion at 20; Reply Br. at 4), which do not meet their high burden to demonstrate that "they will suffer

an injury that is neither remote nor speculative, but actual and imminent" as required for the extraordinary relief of a temporary restraining order. *JTH Tax*, 62 F.4th at 672.

The County Plaintiffs cite several cases to support the undisputed proposition that a "substantial risk of serious illness or death" presents a situation where "monetary damages are difficult to ascertain or are inadequate." (Cnty. Pls.' Br. at 25.) Those cases concerning serious medical illness and death are readily distinguishable because the plaintiffs were able to establish, through both expert and lay testimonial evidence, that a specific illness or disease from which they suffered would result in injury or illness absent the requested preliminary relief. In *Shapiro v. Cadman Towers, Inc.*, for example, the Second Circuit upheld the district court's finding that the plaintiff established irreparable harm to support a preliminary injunction requiring her apartment complex to provide her a parking space inside the apartment's garage where the district court found, based upon testimony from medical experts, that the plaintiff suffered from multiple sclerosis and that requiring her to park on the street could result in humiliation and injury from urinary dysfunction and loss of balance. 51 F.3d 328, 332–33 (2d Cir. 1995). In other words, the plaintiff established, through expert testimonial evidence, that a disease from which she presently suffered could cause symptoms that would increase her risk of injury and humiliation absent injunctive relief. Likewise, in *Innovative Health Systems, Inc. v. City of White Plains*, the Second Circuit upheld the district court's finding of irreparable harm if a drug and alcohol treatment center were to close based on testimonial evidence that the plaintiffs being treated for substance abuse at the center were at risk of relapse and consequent harms, including illness, disability, or death. 117 F.3d 37, 43–44 (2d Cir. 1997), *superseded on other grounds in Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 171 n.7 (2001). Further, the Circuit upheld a finding that one plaintiff in particular would *not* suffer irreparable harm where that individual

had completed treatment at the program and provided no evidence that he continued to use their services. *Id.*[19] By contrast, here, the County Plaintiffs have not presented any evidence showing that K.E.M. or any other woman or girl would be physically injured or be excluded from recognition, accolades, or other long-term benefits from athletic activities by invalidation of the Executive Order, much less a denial of the requested TRO barring Defendants from securing the record supporting issuance of the Executive Order and from taking enforcement action related to the Executive Order.

The County Plaintiffs' second irreparable harm argument is that without the Executive Order, they face "the risk of substantial personal injury judgments by allowing participation on women's athletic teams based on gender identity." (Cnty. Pls.' Br. at 19). This argument has no basis in the record. The County Plaintiffs fail to identify a single past or current personal injury lawsuit filed against them due to an alleged injury suffered by a cisgender women during an athletic endeavor involving the participation of a transgender woman or girl on Nassau County Parks property. Moreover, as noted above, the record does not support the conclusion that any such personal injury lawsuits would imminently be filed against the County if the requested TRO is denied because there are no facts in the record showing that any specific cisgender woman or girl in Nassau County will face imminent injury in an athletic event involving a transgender woman or girl on Nassau County Parks property if the Executive Order is invalidated.

---

[19] *See also New York v. Heckler*, 742 F.2d 729, 736 (2d Cir. 1984) (plaintiffs established irreparable harm where they suffered from mental illnesses and presented "ample evidence" that they would likely suffer "a severe medical setback" as a result of the challenged requirement), *aff'd sub nom. Bowen v. City of New York*, 476 U.S. 467 (1986); *New York v. Sullivan*, 906 F.2d 910, 918 (S.D.N.Y. 1990) (plaintiffs, who had cardiovascular disease, established that irreparable harm would result if they did not receive disability benefits needed to ensure treatment).

Third, the County Plaintiffs argue that irreparable harm is "presumed" in this case because the Complaint alleges that "the NYS AG is effectively seeking to deprive Plaintiffs their constitutional right to equal protection." (Cnty. Pls.' Br. at 25.) The County Plaintiffs misstate the law. As discussed, "the mere allegation of a constitutional infringement in and of itself does not constitute irreparable harm." *Pinckney v. Bd. of Educ. of Westbury Union Free Sch. Dist.*, 920 F. Supp. 393, 400 (E.D.N.Y. 1996). The burden remains on the County Plaintiffs to "convincingly show[]" irreparable constitutional injury in order to secure a temporary restraining order. *Donohue*, 886 F. Supp. 2d at 150; *KM Enters.*, 2012 WL 540955, at *4 (same); *Weinstein*, 120 F. Supp. 3d at 297 (same). Based on the current record before the Court, the County Plaintiffs fail to meet this burden because: (1) Eleventh Amendment sovereign immunity bars Plaintiffs' equal protection claim for declaratory and injunctive relief against Defendants New York and the OAG, and Plaintiffs' claim for retrospective declaratory relief against James; (2) the County Plaintiffs lack the capacity to bring their equal protection claim under Rule 17(b) and New York's capacity-to-sue rule; and (3) all of the Plaintiffs lack standing to bring the sole equal protection claim pled in the Complaint. *See supra*, Section I.

## III.   Balance of Hardships and Public Interest

A plaintiff seeking a temporary restraining order must additionally establish that the "public interest" and "balance of equities" of the parties weigh in favor of granting the injunction. *Yang*, 960 F.3d at 127. "When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge." *We the Patriots USA, Inc.*, 17 F.4th at 295. The Court declines to address these factors because the County Plaintiffs' submissions do not meet the critical requirements of showing a likelihood of success on the merits of their equal protection claim and irreparable harm in the absence of the requested temporary restraining order.

**CONCLUSION**

For the reasons set forth above, the Court denies the County Plaintiffs' TRO Motion

(ECF No. 10) and reserves decision on the PI Motion pending resolution of Defendants' Motion

to Dismiss (ECF No. 20).


Dated: Central Islip, New York

April 4, 2024

                                   /s Nusrat J. Choudhury
                                   NUSRAT J. CHOUDHURY
                                   United States District Judge